Jeffrey R. Krinsk, Esq.  (SBN109234)
jrk@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
David J. Harris, Esq. (SBN 286204)
djh@classactionlaw.com
FINKELSTEIN & KRINSK LLP
550 West C Street, Ste. 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Plaintiff
and the Putative Class*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| **JOHN UNDERWOOD**, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br>v.<br><br>**FUTURE INCOME PAYMENTS, LLC; PENSIONS, ANNUITIES AND SETTLEMENTS, LLC; CASH FLOW INVESTMENT PARTNERS, LLC; AND SCOTT A. KOHN**,<br><br>                   Defendants. | Case No:  17-cv-1570<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, by his attorneys, on behalf of himself and all others similarly situated, makes the following allegations pursuant to the investigation of his counsel and based on information and belief, except as to allegations pertaining to personal knowledge as to himself.

## I.    NATURE OF THE ACTION

1.    This is a class action against Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; Cash Flow Investment Partners, LLC; and Scott A. Kohn (collectively, "Defendants" or "FIP") concerning Defendants' unlawful marketing, lending, and collection practices.

2.    Plaintiff John Underwood ("Plaintiff" or "Mr. Underwood") is a retired and disabled veteran of the United States Air Force and brings this action on behalf of himself and others similarly situated stating claims for (1) Declaratory Relief, Code of Civil Procedure § 1060, (2) the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, (3) the California Usury Law, Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. 1919-1, (4) the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, (5) the Federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (6) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and (7) unjust enrichment. All of these causes of action arise from Defendants' pattern and practice of entering into transactions with retired and/or disabled veterans that contain numerous unconscionable and otherwise unenforceable provisions, and which are disguised loan transactions bearing usurious effective interest rates. Further, in connection with such transactions, Defendants' documents purport to obtain, in effect, assignment of retired military benefits, which are unenforceable in light of the anti-assignment provisions found at 37 U.S.C. § 701(c) and 38 U.S.C. § 5301(a)(1), (3).

3.    Defendants are engaged in the business of entering into loan transactions, which they call "Purchase and Sale Agreements," with retired and/or disabled veterans. Under the terms of these contracts, Defendants loan the veteran a sum of money in exchange for a promise by the veteran to make future payments secured by the veteran's military retirement or disability payments. Defendants attempt to disguise the nature of these transactions by inserting into their form contracts a clause stating that the transaction "is not a loan." However, the transactions are—in substance and

- 2 -

by law—loans from Defendants to the veteran.

4.      Regulators for the States of California, New York, Massachusetts, Iowa, Washington, North Carolina, Colorado, Pennsylvania, and Minnesota and the City of Los Angeles have all determined that Defendants' products *are loans*.[1]

5.      The terms of these loans are usurious and otherwise unfair and unlawful. For example, the imputed interest rate on the transaction between Defendants and Mr. Underwood is 41.422%, which far exceeds the applicable usury limit. *See* Art. XV, Sec. 1, of the California Constitution.[2]

6.      The assignment of military pension pay of enlisted military personnel upon retirement is prohibited by 37 U.S.C. § 701(c). Similarly, the assignment of disability benefits to all military veterans regardless of rank is illegal under 38 U.S.C. § 5301(a)(1) and (a)(3)(A) and (C). The contract between Defendants and Mr. Underwood, and the similar contracts between Defendants and the class members, effectively purport to obtain an illegal assignment of retired military pension and disability benefits in violation of these provisions. As a result, these contracts are void as a matter of law.

7.      In addition, Defendants' practices of requiring Plaintiff and class members to assign their military benefits in violation of federal law, and their representations intended to induce veterans to enter into these contracts and assign their benefits, constitute unfair, deceptive, and unconscionable acts or practices in the conduct of business, trade, or commerce, and are barred by state law.

## II.      JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the claims asserted herein individually and

---

[1] *See, e.g.*, David Lazarus, "'Pension Advance' Company is Unmasked—And It's No Friend of California Consumers," LA Times (Mar. 14, 2017), *available at* http://www.latimes.com/business/lazarus/la-fi-lazarus-cfpb-future-income-payments-20170317-story.html; Mark Brunswick, "Minnesota attorney general sues companies that allegedly bilked veterans and seniors," Star Tribune (Aug. 17, 2017), *available at* http://www.startribune.com/minnesota-ag-sues-companies-that-allegedly-bilked-veterans-and-seniors/440766003/.

[2] "Generally, the California Constitution sets a maximum annual interest rate of seven percent on loans and forbearances, but allows parties by written contract to set the interest rate at up to 10 percent . . . ." *WRI Opportunity Loans II LLC v. Cooper*, 154 Cal. App. 4th 525, 533, 65 Cal. Rptr. 3d 205 (2007) (citations and quotations omitted).

PLAINTIFFS' CLASS ACTION COMPLAINT

on behalf of the Class pursuant to 28 U.S.C. §1331 because one or more of the claims arise under the laws of the United States. Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and (2) at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

9.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction as to state law claims not covered by 28 U.S.C. § 1332.

10.    Personal jurisdiction is proper because a substantial part of the events or omissions giving rise to the claims occurred in the State of California: Defendants advertised to, solicited, and made and collected pension loans to and from pensioners, including Plaintiff, from Defendants' California headquarters. Moreover, the contractual documents prepared by Defendants and entered into by Plaintiff and the class members specify that the state or federal courts located in California shall have non-exclusive jurisdiction to hear and determine any claims or disputes pertaining or relating to the agreements.

11.    Personal jurisdiction is also proper because Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; and Cash Flow Investment Partners, LLC ("LLC Defendants") maintain a principal place of business at 18300 Von Karman Ave., Suite 410, Irvine, CA 92612 and maintain a registered agent, Scott Kohn, at 3535 E. Coast Highway #119, Corona Del Mar, CA 92625. All located within this District.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because all LLC Defendants are subject to Personal Jurisdiction in this District and the individual defendant—Scott Kohn—resides in this district.

13.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Moreover, the contractual documents prepared by Defendants and entered into by Plaintiff and the class members specify this Court as a proper venue for litigating issues pertaining to the terms of those documents.

PLAINTIFFS' CLASS ACTION COMPLAINT

### III.    PARTIES

14.    Plaintiff, John Underwood, is a retired enlisted military veteran residing in Otway, Ohio. Mr. Underwood retired from the United States Air Force as a Master Sergeant in 2010 after 23 years of military service with a retirement income of $2,053 per month.

15.    Defendant FIP is a Delaware limited liability company with its principal place of business, as registered with the Nevada Secretary of State, at 2505 Anthem Village Dr., Ste E-599, Henderson, Nevada 89052 and its principal place of business, as registered with the California Secretary of State, at 18300 Von Karman Ave., Suite 410, Irvine, CA 92612. FIP was formed in April 2011 and has conducted business from 18300 Von Karman Ave., Suite 410, Irvine, California 92612, and from 3535 East Coast Highway, #119, Corona del Mar, California 92625.

16.    FIP formerly did business as Pensions, Annuities & Settlements, LLC.

17.    When Pensions, Annuities & Settlements, LLC, changed names to FIP in 2011, FIP assumed all of Pensions, Annuities & Settlements, LLC's debts, obligations, rights, and liabilities.

18.    FIP actively collected the loan repayments for loans entered into under its prior entity, Pensions, Annuities & Settlements, LLC.

19.    FIP is Pensions, Annuities & Settlements, LLC's successor and liable for all allegations in this complaint that apply to Pensions, Annuities & Settlements, LLC.

20.    FIP has or had the following marketing affiliates, all operating out of 18300 Von Karman Ave., Suite 410, Irvine, California 92612: Cash Flow Investment Partners, LLC (http://www.lumpsum-settlement.com); BuySellAnnuity, Inc. (http://www.buysellannuity.com); and Pension Advance, LLC.

21.    FIP's business model is to solicit pensioners through the websites of its marketing affiliates and enter into contracts with pensioners in which pensioners receive a lump sum of money in exchange for some or all of the pensioners' monthly pension payments for a fixed period of time, generally five to ten years. FIP also enters into contracts with investors, who provide money for the lump sum cash payments and receive some or all of pensioners' monthly pension payments.

22.    FIP and its marketing affiliates operate as a single integrated enterprise and are all jointly and severally liable for the allegations in this complaint.

PLAINTIFFS' CLASS ACTION COMPLAINT

23.     Defendant Scott A. Kohn is an individual who owns 100% of FIP and is its President, Secretary, and Treasurer. Mr. Kohn is FIP's sole Member, as defined in FIP's articles of formation, and as such has complete authority, power, and discretion to make any and all decisions regarding FIP. Mr. Kohn is also the sole owner of FIP's affiliated marketing entities, Cash Flow Investment Partners, LLC; BuySell Annuity, Inc.; and Pension Advance, LLC.

24.     At all relevant times alleged in this matter, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency regarding the acts and omissions alleged and are thus jointly and severally liable for the allegations in this complaint.

## IV.    BACKGROUND

### A.    Military pension scams are stealing income from debt-burdened veterans

25.     In May 2003, the National Consumer Law Center, Inc. ("NCLC")[3] was researching consumer scams perpetrated on active military personnel and ultimately issued a report entitled *In Harm's Way-At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans*.[4] While not the primary focus of the investigation, the report disclosed that the Judge Advocate General Corps felt that some of the greatest abuses they were seeing concerned the solicitation of retired military personnel to gain access to their pension payments.

26.     NCLC discovered that companies and individuals were targeting veterans' benefits, usually by offering an up-front cash payment in return for several years of the veteran's monthly benefit, thus creating a growing threat to elder veterans and their dependents. These schemes

---

[3] NCLC is a non-profit Massachusetts Corporation, founded in 1969, specializing in low-income consumer issues, with an emphasis on consumer credit. On a daily basis, NCLC provides legal and technical consulting and assistance on consumer law issues to legal services, government, and private attorneys representing low-income consumers across the country. NCLC publishes a series of twenty practice treatises on consumer credit laws, including Unfair and Deceptive Acts and Practices (8th Ed., 2012), updated at www.nclc.org/library, and Cost of Credit: Regulation, Preemption, and Industry Abuses (4th Ed., 2009), updated at www.nclc.org/library, as well as periodic reports on a range of topics related to consumer credit issues and low-income and elderly consumers. NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income and elderly people, conducted training for thousands of legal services and private attorneys on the law and litigation strategies to deal with predatory lending, unfair debt collection practices, and other consumer law problems, and provided extensive oral and written testimony to numerous Congressional committees on these topics.

[4] https://www.nclc.org/images/pdf/special_projects/military/report-scams-facing-military.pdf

PLAINTIFFS' CLASS ACTION COMPLAINT

produced huge profits for the scammers, deprived veterans of funds they needed for their long-term financial security, and, NCLC contended, were illegal.

27.    Veterans receiving retirement and disability benefits are highly attractive targets for financial exploitation:

• Retirement and disability benefit payments are regular, very dependable, and long-term. Furthermore, it is very easy to arrange automatic transfer of the funds each month through "allotments" set up through the Defense Finance and Accounting Servicer. A company that can convince a veteran to sign over rights to his or her pension payments, and can enforce such an agreement, faces an extremely low risk of non-payment. The companies often reduce this risk even further by requiring the veteran to buy life insurance and designate the company as the beneficiary.

• Veterans are easy to reach through affinity marketing and advertising in targeted publications such as the Military Times Network. Although these publications are produced by a private, for-profit corporation, many service members and veterans perceive them to be "official" and assume that advertisers are screened or approved in some way. The companies may also use the internet, relying upon lead generators, referral networks, and commissions to reach more potential victims.[5]

• Veterans may have, or perceive themselves to have, unusually heavy debt burdens or poor credit as a result of the financial strains of deployments, frequent relocations, and other challenges of military service. Veterans, many of whom enlisted at a young age, may also be less familiar with the landscape of legitimate lenders and financial institutions.

28.    A number of companies targeted military veterans by offering lump sums in exchange for the veteran's promise to redirect monthly benefits payments directly to the company for a fixed number of years. The cost of these transactions can be astronomically high: NCLC has found

---

[5] The then-homepage of Veterans First Financial Services was highlighted in the Harm's Way report. The advertisement featured an undulating American flag and, at the top, an eye-grabbing, full-color display of military insignias in motion across the screen. A three-part message flashed over those insignias: "You've worked hard—invest your money the way YOU want—If you're a retired veteran, VFFS, Inc. can help!"

PLAINTIFFS' CLASS ACTION COMPLAINT

agreements with effective APRs of 27% all the way up to 106%. These typically are not small-dollar transactions – the agreements NCLC has examined involved principal amounts that sometimes exceed $100,000, and on average fall in the range of $40,000-$55,000.

29.    The companies try to characterize the transactions as sales or assignments rather than loans for two reasons. First, as the owner of one such company admitted in a deposition, they want to make the transaction non-dischargeable in bankruptcy. Where a true assignment or sale has taken place, the purchaser may have a property interest in the income stream that is unaffected by bankruptcy; in other words, the obligation effectively cannot be discharged by the veteran. Second, the companies want to avoid disclosure requirements and usury limits imposed by state law.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Advertising and solicitation

30.    During the relevant period, FIP advertised to and solicited pensioners across the nation—including in California—through its marketing affiliates' websites and other websites.[6]

31.    FIP advertised its product as a way for pensioners to obtain cash quickly to meet their immediate needs and long-term goals. Calling the product a "lump sum," "pension buyout," and/or "pension advance," FIP's websites stated that it accepted most types of pension payments, including pensions from private companies, state or federal government pensions, military pensions, fire and police department pensions, and teachers' pensions.

32.    FIP also received referrals from other pension lenders and bought consumer leads from websites similar to its own websites.

33.    FIP paid third parties to steer internet-search traffic to its websites, including a website with the uniform resource locator "http://www.lumpsum-pensionloans.com," by targeting consumers who conducted searches for FIP-approved phrases such as "personal loans," "pension loan," "on line loan," or "military retirement loan," among others.

34.    Nevertheless, FIP instructed its employees to avoid any mention of loans. Its

---

[6] For general background on FIP's business practices, *see, e.g.*, *In re. Future Income Payments, LLC*, NY Dept. Fin. Servs. (Oct. 20, 2016) (Consent Order), *available at* http://www.dfs.ny.gov/about/ea/ea161020.pdf.

PLAINTIFFS' CLASS ACTION COMPLAINT

telephone marketing script for inbound calls from interested consumers warned employees that "saying or mentioning 'Pension Loan' or the word 'loan' is an autofail."[7]

35.    In addition, the FIP product training manual stated that FIP purchases "future pension payments, and pay[s] sellers a lump sum in exchange for those payments" and that its product "is not a loan," but acknowledged that "the IRS views it similar to a loan."[8]

36.    Despite this training and FIP's characterization of its products as sales in its online advertising and promotional materials, between 2011 and the present date, some FIP employees referred to FIP's product as a loan when communicating with consumers. For example, in a 2016 investigation of FIP, the New York State Department of Financial Services discovered the following: instances of FIP employees introducing themselves as calling from "Pension Loans" or "Lumpsum Pension Loans"; using email addresses with the domain name of "@lumpsum-pensionloans.com"; at least one employee referring to a consumer's "loan application" when communicating with the consumer; and another employee instructing a consumer to submit certain documents "to make the loan possible."[9]

37.    Consumers referred to the product as a loan and FIP as a lender in their communications with FIP. FIP only occasionally corrected consumers who used such terminology.

### B.    Pension loan offer

38.    Consumers contacted FIP through its websites or by phone to obtain a quote and begin the application process. Representatives of FIP communicated with pensioners by phone, letter, or email to provide a quote for the loan amount and begin collecting information and documents from the pensioner to allow FIP to complete the underwriting process.

39.    Pensioners were asked to submit a number of documents relating to their pension and financial situation, as well as documents evidencing their identity and marital status, to undergo a credit check and bankruptcy review, and to answer certain questions regarding their medical history. Many pensioners were asked to submit proof of life insurance as well.

---

[7] *Id.* at ¶ 7.
[8] *Id.* at ¶ 8.
[9] *Id.* at ¶ 9.

PLAINTIFFS' CLASS ACTION COMPLAINT

40.    After verifying the pensioners' information and deciding to extend an offer, FIP proposed to pensioners a lump sum of cash in exchange for a specified amount of the pensioners' monthly pension payments.

41.    To complete the loan process, FIP required pensioners to complete and sign several documents provided by FIP in what FIP referred to as the "Seller Packet." FIP used several versions of the documents in the Seller Packet during the relevant period.

42.    The Seller Packet consisted of approximately nine documents: (1) a contract entitled "Future Income Stream Purchase and Sale Agreement," "Buyer and Pensioner Purchase Agreement for Purchase of Future Income Stream," or "Future Income Payment Purchase and Sale Agreement"; (2) Transaction Details; (3) Authorization for Automatic Payments; (4) Disclosures and Acknowledgments; (5) Certificate of Marital Status; (6) Security Guaranty and Indemnification Agreement; (7) Purchase Agreement; (8) Employment Verification Form; and (9) W9-Request for Taxpayer Identification Number and Certification.

43.    In addition, depending on which version of the agreement was used, pensioners were asked to submit some or all of the following documents: (1) proof of life insurance policy with death benefits amount; (2) collateral assignment form assigning the life policy benefits to a FIP-designated assignee; (3) letter from the pensioner's pension payor confirming pension eligibility, amount, and term; (4) photographic identification, usually a driver's license; (5) voided check; (6) if previously married, a marital support document; (7) if the pensioner was self-employed, a copy of his or her personal or corporate tax return; and (8) a bill showing telephone or cellular phone details.

44.    Once FIP received and verified all documents, pensioners executed a loan agreement with FIP.

### C.    The loan agreement

45.    FIP's loan agreement provided that the pensioner would receive a "one-time, lump sum payment" in exchange for a specified amount of the pensioner's monthly pension for a specified number of months.

46.    Although the agreements were between FIP and pensioners, the agreements provided that FIP intended to sell and would sell the monthly pension payments remitted by pensioners and

assign FIP's rights under the agreement to third parties. These third parties were the investors who provided the lump sum funds that were paid to pensioners.

47.    The transactions contractually obligated pensioners to repay the lump sum loan amounts by monthly payments over the term set by the loan agreement.

48.    Until 2015, the pensioners personally guaranteed repayment of the lump sum loan amounts and monthly installment payments over the term set by the loan agreement.

49.    Upon receipt of the lump sum amount into the pensioners' own bank accounts, the pensioners instructed the bank or financial institution at which their pension payments were deposited to transfer a specified amount of the pensions into a FIP-controlled account. To facilitate collection of the obligated payments, pensioners executed an authorization for electronic funds transfer granting FIP the power to collect the monthly pension installment payments from the pensioners' accounts.

50.    Many pensioners also used credit or debit cards to make their monthly payments.

51.    FIP deducted $300 from the lump sum amount as an account set-up fee and servicing fee, and until September 2014 charged pensioners a "Management Fee" of $10 per month for "services rendered in connection with the collection of cash flows."

52.    FIP's contracts with investors provided that pensioners would remit their monthly pension payments to a FIP master account, called the "Payment Account," and FIP would thereafter remit the payments to the investor. The investor contracts did not include any information regarding the set-up and management fees FIP charged pensioners and took from their lump sum and monthly installment payments.

53.    Although FIP's agreements referred to the transaction as a "sale" or "valid sale" and stated that the product is not a loan, the transaction lacked features of a sale, such as notification to third parties or the transfer of tax liability to the "purchaser." Rather, the transactions had all the indicia of a loan. For instance:

      a.    The agreements provided for an advance of money to pensioners and, conditioned only on the failure of their pension payor to continue making payments, pensioners' promise to repay in installments over a period set by the agreements.

b.  The agreements acknowledged that the lump sum amount was "significantly less" than the amount that the pensioner would pay under the agreement, and some stated the difference between the amount pensioners received as a lump sum and the amount they would have collected and retained if the transaction with FIP had not taken place. This difference, referred to in the agreements as the "discount," was, in fact, the interest that the pensioner paid over the course of the loan. The APR, however, was not disclosed.

c.  Prior to extending the loan, FIP reviewed the borrower's credit risk and engaged in standard loan underwriting assessment. For example, in order to obtain the loan approval, the borrower was required to verify the amount of his or her retirement or disability benefits by supplying FIP with income tax returns, pay checks or stubs, and evidence of other income and financial status. After receiving verification of the prospective borrower's income and the other financial information, FIP provided the loan documents to the prospective borrower.

d.  In the agreements, FIP reserved a security interest in the pensioner's retirement or disability benefits. In essence, Defendants paradoxically claim they purchase the pensioner's benefits and also have a security interest in these benefits.

e.  Pensioners were required to personally guarantee repayment of the lump sum and monthly installment payments.

f.  The loan agreements had stringent recourse provisions in the event a pensioner failed to make the monthly payments: any disruption, interruption, decrease, or elimination of payments was deemed a material breach of the contract and caused all remaining and unpaid payments to be immediately due and payable.

g.  The agreements also provided that any breach could require a pensioner to pay FIP's and any subsequent purchasers' legal fees and costs incurred pursuing a claim against the pensioner.

h.  Pensioners who failed to make timely payments were charged late fees equal to 1.5% of the delinquent payment. Payments returned to FIP for insufficient funds resulted in

PLAINTIFFS' CLASS ACTION COMPLAINT

a $55 fee, in addition to any late fees.

54.    Some of the agreements FIP entered into with pensioners contained provisions stating that any "intentional violation" of the pensioner's obligations under the contract that "deprived [FIP] of the economic benefits contemplated by this agreement could under certain circumstances, constitute criminal conduct, punishable by criminal fines or imprisonment."

55.    The agreements FIP entered into with pensioners contained numerous other provisions which are unconscionable, illegal, or otherwise unenforceable, including language purporting to:

a.    illegally bind borrowers' heirs;

b.    effect a waiver of certain legal remedies and rights; and

c.    exclude the borrower's obligations under the agreement and the security interest granted therein from the borrower's bankruptcy estate.

56.    The agreements FIP entered into with pensioners contained a choice-of-law provision that specifically selects California law to govern the agreements.

### D.    FIP kicked out of California and charged with predatory lending

57.    FIP maintained its principal place of business in Irvine, California, until the California Commissioner of Business Oversight ("Commissioner") issued a March 3, 2015 cease-and-desist order, charging that the company was issuing loans without a license in violation of California Financial Code Section 22100, *et seq*. The Commissioner ordered FIP to desist and refrain from engaging in the business of a finance lender or broker in the State of California without first obtaining a license from the Commissioner or otherwise being exempt. "[FIP] insisted that they weren't making loans, that what they were offering were 'sales agreements,'" said Tom Dresslar, a spokesman for the California Department of Business Oversight. "That was wrong. They were loans."[10]

58.    In February 2017, Los Angles City Attorney Mike Feuer ("City Attorney Feuer")

---

[10] David Lazarus, "'Pension Advance' Company is Unmasked—And It's No Friend of California Consumers," LA Times (Mar. 14, 2017), *available at* http://www.latimes.com/business/lazarus/la-fi-lazarus-cfpb-future-income-payments-20170317-story.html.

PLAINTIFFS' CLASS ACTION COMPLAINT

filed suit against FIP, alleging that the company "charged interest rates as high as 96%, far above California's 10% usury limit, and threatened borrowers, falsely, that defaulting on the loans could subject them to criminal liability." In a statement, City Attorney Feuer called this "predatory lending" and said that such practices "can exploit the very real financial struggles of California's most vulnerable residents, including seniors and veterans."[11]

59.    According to the lawsuit, FIP also subjects pensioners in default to illegal and harassing debt collection practices, such as repeated telephone calls starting as early as 5:30 a.m. In addition, the lawsuit alleges that FIP solicits California investors to invest in underlying pension loans, but fails to disclose material information and makes material misrepresentations. For example, the lawsuit alleges that FIP affirmatively assures investors (falsely) that the pension loans comply with all applicable laws. As a result, investors unknowingly bear the risk of loss on loans which are legally challenged or deemed void.

60.    City Attorney Feuer seeks, among other things, an injunction prohibiting FIP from collecting on the predatory loans issued to California pensioners, as well as selling unlawful and fraudulent loans to California investors. In addition, City Attorney Feuer seeks restitution for pensioners, as well as civil penalties.

### E.    FIP shut down in New York and forced to repay

61.    In 2016, the New York State Department of Financial Services (the "Department") commenced an investigation to determine whether FIP violated New York Banking and Financial Services Laws by lending without a license, making usurious loans, conducting money transmitting without a license, and making intentional misrepresentations regarding a financial product or service in the State of New York. The Department concluded that:

a.    FIP entered into loan agreements pursuant to which New York pensioners borrowed a lump sum of money in exchange for some or all of the pensioner's monthly pension payments;

b.    FIP made loans in New York State without a lending license;

---

[11] http://www.lacityattorney.org/single-post/2017/02/16/City-Attorney-Mike-Feuer-Sues-to-End-Allegedly-Predatory-Pension-Loan-Business.

PLAINTIFFS' CLASS ACTION COMPLAINT

c.    FIP charged a rate of interest on the loans they entered into with New York pensioners that exceeded the rate permitted by New York Banking and General Obligations Laws;

d.    FIP transmitted money to and from New York State without a money transmitter license; and

e.    FIP misrepresented to New York pensioners the legal status of the transactions by mischaracterizing the loans as sales of an asset, misrepresenting the interest charged by calling it a discount, and omitting the APR.

62.    On October 20, 2016, the Department and FIP entered into a Consent Order ("Order"), requiring FIP to pay a $500,000 civil penalty to the Department, cease all consumer-related transactions within New York State or with any New York resident, and refrain from participating in any money-transmitting activity in New York State except to the extent required to fulfill their obligations pursuant to the Order.

63.    The Order further required FIP to reform the agreements previously entered into with New York pensioners as follows:

a.    The total amount owed for each agreement shall be revised to equal only the lump sum advanced;

b.    The reformed agreements shall reflect that pensioners shall have no further payment obligation beyond the lump sum amount set forth in their agreements;

c.    All payments already made by New York pensioners shall be applied to the lump sum amounts; and

d.    FIP will forgive all amounts due ($6,348,232 across 292 transactions) in excess of the amount advanced.

### VI.    ALLEGATIONS RELATING TO PLAINTIFF

64.    Plaintiff John Underwood is a resident of Scioto County, State of Ohio.

65.    Mr. Underwood served for 23 years in the United States Air Force, attaining the rank of Master Sergeant.

66.    In 2010, Mr. Underwood retired from the U.S. Air Force.

- 15 -

67.     Sometime thereafter, Mr. Underwood saw an advertisement placed by FIP through a Google search advertising a way for military personnel to obtain cash advances.

68.     In approximately December 2012, Mr. Underwood contacted Pensions, Annuities, and Settlements, LLC, and the parties began to correspond regarding Defendants providing upfront cash to Mr. Underwood in exchange for his payment of a substantially larger amount over time. After eliciting information regarding Mr. Underwood's military retirement benefits, checking his credit, and obtaining other underwriting information, Defendants informed Mr. Underwood that FIP would provide him $10,000.00 in cash, less a $300 setup fee, in exchange for, among other things, Mr. Underwood's promise to pay to FIP $397 per month for 60 months.

69.     On or about December 29, 2012, Mr. Underwood was forwarded a document titled, "Future Income Stream Purchase and Sale Agreement" by Pensions, Annuities and Settlements, LLC, which provided for the exchange of upfront cash for payments over time as described in the previous paragraph above. On or about December 19, 2012, Mr. Underwood executed the Purchase and Sale Agreement. This Agreement required Mr. Underwood to instruct the bank or financial institution to which his pension and disability payments are paid to forward monthly payments in an amount equal to $397 to an account established by Defendants. The Agreement purported to waive Mr. Underwood's right to redirect such payments to any other destination and included severe penalties should Mr. Underwood so direct any such payments.

70.     The gross loan proceeds from the above-described transaction was $10,000.00. In addition, Mr. Underwood had to pay a one-time $300 account setup and servicing fee—which was withheld from the gross loan proceeds of $10,000.00—and a $10 monthly management fee.

71.     Mr. Underwood thus received $9,700.00 ($10,000 less $300) as net loan proceeds. For such loan, Mr. Underwood was required to assign a portion of his military and disability pension in the amount of $397 per month for 60 months. To date, Mr. Underwood has already paid Defendants at least $20,644 in pension payments that includes $520 in monthly management fees.

72.     Over the term of the loan, Mr. Underwood would repay $23,820.00 (not including setup fees). The imputed interest rate on such a loan is 41.422%. If an event occurred which resulted in accelerated payment, such as a material breach of the Agreement, the imputed interest rate would

1    be even higher.

2        73.    Mr. Underwood relied on the representations made by Defendants, as alleged herein,

3    and was injured as a result. For example, Mr. Underwood relied on the representation that the

4    "Future Income Stream Purchase and Sale Agreement" was not a "loan." Additionally, FIP failed to

5    disclose material information from Mr. Underwood, such as the fact that assignment of his military

6    pension and/or disability benefits is expressly prohibited by federal law. Based on Defendants'

7    misrepresentation and/or omissions, Mr. Underwood was injured as a result from being charged a

8    higher interest rate than would otherwise be allowable under California law and having his military

9    pension and/or benefits unlawful assigned. Had Mr. Underwood known the true nature of the

10   transactions, he would not have entered in to the "Future Income Stream Purchase and Sale

11   Agreement."

12       **VII.**    **CLASS ALLEGATIONS**

13       74.    This action is brought as a class action pursuant to Federal Rule of Civil Procedure

14   Rule 23. The proposed class is defined as follows:

15       All retired enlisted military personnel or disabled military personnel of any rank who
16       have entered into a transaction with Defendants in which Defendants paid upfront
    cash in return for the veteran's promise to redirect monthly pension or disability
17       benefits directly to any Defendant.

18   Excluded from the class are any persons who have previously obtained a judgment or settled any

19   claims against Defendants concerning the types of claims asserted herein or have previously

20   executed releases precluding any such claims against Defendants.

21       75.    This action is brought as a class action pursuant to Federal Rule of Civil Procedure

22   Rule 23. The proposed class is defined as follows:

23       76.    There are genuine questions of law and fact common to the class that predominate

24   over any individual questions. These common questions, which demonstrate a community of interest

25   among class members, include:

26       a.    Whether the form transactions Defendants have entered into with class members

27       should be classified as loans under applicable law;

28

PLAINTIFFS' CLASS ACTION COMPLAINT

b.      Whether Defendants' transactions involve the obtaining of an assignment of the class members' right to receive military pension benefits and, if so, whether such renders the transactions illegal and either void ab initio or voidable at the option of the veteran;

c.      Whether the form documents drafted by Defendants and used by them in their transactions with class members contain provisions which are unconscionable and unenforceable;

d.      Whether California law should be applied in assessing the legality of Defendants' transactions, regardless of where the veteran resides, as stated in the form contract documents drafted by Defendants;

e.      Whether Defendants' conduct violates the Unfair Competition Law;

f.      Whether Defendants' transactions impose interest rates in excess of the maximum rate permitted under Cal. Const. Art. XV, § 1 and the Usury Law;

g.      Whether Defendants' conduct violates the Consumer Legal Remedies Act;

h.      Whether Defendants failed to disclose certain material credit terms in violation of the Truth in Lending Act;

i.      Whether Defendants' conduct violates the unlawful debt collection provisions of the Racketeer Influenced and Corrupt Organizations Act;

j.      Whether Defendants have been unjustly enriched by the retention of payments by class members in the manner described within;

k.      Whether Defendants should be enjoined from continuing to procure the assignment of military retirement and disability pension benefits;

l.      Whether Defendants should be ordered to provide restitution to the class;

m.      Whether class members are entitled to an award of damages as a result of Defendants' conduct, and if so, in what amount; and

n.      Whether class members are entitled to disgorgement of any funds received by Defendants, and if so, in what amount.

77.      The claims of Plaintiff are typical of the claims of the class members. Each class member was subjected to the same illegal conduct of Defendants, was harmed in the same way, and

has claims for relief under the same legal theories.

78.    Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has common interests with all members of the class and will vigorously protect the interest of the class through qualified counsel experienced in handling class action and consumer protection cases. Neither the named Plaintiff nor class counsel has any interests which would conflict with the interests of the class members.

79.    A class action is a superior method for the fair and efficient adjudication of this controversy. Most class members are unaware of the availability of legal challenge to the transactions they entered into with Defendants. Moreover, given the common questions to be resolved, class litigation is the superior method of resolving these legal challenges in one proceeding, thus avoiding a multiplicity of parallel suits. A class action will avoid the possibility of inconsistent adjudications of the same legal question.

## **FIRST CAUSE OF ACTON**
### **(Declaratory Relief, 28 U.S.C. §§ 2201 *et seq*. )**

80.    Plaintiff restates all prior allegations as though fully pled herein.

81.    An actual and justiciable controversy exists between the parties as to their respective rights and obligations under the form document entitled "Purchase and Sale Agreement" (the "Agreement"), which each class member has entered into with Defendants. Plaintiff, on behalf of the class, contends that some or all of the provisions in the Agreement are illegal, void, voidable, unconscionable, and/or unenforceable. Plaintiff is informed and believes that Defendants contend to the contrary.

82.    Plaintiff seeks the following declarations regarding his obligations, and those of class members, under the Agreement:

a.    The transaction evidenced by the Agreement is, under law and equity, a loan, subject to applicable usury limitations on the maximum permissible rate of interest which may be charged and recovered;

- 19 -

b.    Defendants may not enforce or collect any amount from Plaintiff or class members beyond return of the principal of the loan, because the interest rate evidenced in the Agreements with Defendants exceeds the maximum permissible rate set forth in Cal. Const. Art. XV, § 1;

c.    The provisions of the Agreement purporting to require Plaintiff and class members to provide Defendants direct access to military benefits are void and unenforceable attempts to circumvent the prohibition upon assignments of military benefits set forth in 38 U.S.C. § 5301(a)(3)(C), 37 U.S.C. § 701(c), 15 U.S.C. §§ 1601, et seq., and 16.C.F.R. § 444.2(a)(3);

d.    The provision in the Agreement purporting to cause all remaining and unpaid payments to be immediately due and payable if there is "any disruption, interruption or decrease in those payments . . . caused by the [veteran]" is an unenforceable penalty clause; and

e.    The Agreement is unconscionable and unenforceable, and/or void as a matter of law.

WHEREFORE Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Violation of the California Unfair Competition Law, Bus. & Prof. Code §17200 *et seq*. ("UCL"))

83.    Plaintiff restates all prior allegations as though fully pled herein.

84.    Defendants' practice of requiring Plaintiff and class members to assign their right to receive military pension and/or disability benefits is expressly prohibited by federal law as alleged herein. Moreover, Defendants' transactions involve the assessment of interest that exceeds the maximum rate set forth in Cal. Const. Art. XV, § 1, violate the CLRA, and violate California Civil Code, section 1670.5. Therefore, Defendants' practices constitute unlawful competition under the "unlawful prong" of the UCL.

85.    The acts complained of herein, including the disguising of loan transactions as non-loan transactions, the insertion into contracts of numerous unconscionable and unenforceable terms, the presentation of misleading descriptions of the purported benefits of its transactions to veterans, and the charging of imputed interest in excess of the legally permitted rate, constitute unlawful

PLAINTIFFS' CLASS ACTION COMPLAINT

competition under the "unfair" and "fraudulent" prongs of the UCL.

86.    These acts offend established public policies or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Alternatively, these acts cause harm to veterans which outweigh any utility flowing from them.

87.    The acts complained of herein, including the disguising of loan transactions as non-loan transactions, in order to charge a higher interest rate, are also capable of deceiving a reasonable consumer.

88.    Plaintiff has suffered an economic injury and has lost money or property as a result of Defendants' acts of unfair competition.

89.    On information and belief, Defendants continue to engage in some or all of these unlawful acts and will continue to do so unless enjoined. As a result of these acts of unfair competition, over the last four years Defendants have obtained money or property from Plaintiff and class members which they should not, in equity, be permitted to retain, including but not limited to excess interest payments. Plaintiff and the general public are entitled to injunctive relief, restitution, and other equitable relief.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### (The Usury Law, Cal. Const. Art. XV, § 1)

90.    Plaintiff restates all prior allegations as though fully pled herein.

91.    As alleged above, Plaintiff and class members have paid to Defendants interest in excess of the maximum permissible rate authorized under Cal. Const. Art. XV, § 1. Pursuant to the Usury Law, Stats. 1919, p. xxxiii, Deering's Uncod. Initiative Measures & Stats. 1919-1, Plaintiff and class members are entitled to repayment from Defendants of treble the amount of all such interest paid within one year past.

92.    The transactions entered into between Defendants, on the one hand, and Plaintiff and class members, on the other, were in substance loans calling for usurious rates of interest. Under the terms of these transactions, usurious interest was absolutely payable by Plaintiff and class members. On information and belief, Defendants willfully entered into each of the transactions with Plaintiff

and class members, intending to receive the interest payments called for under those transactions.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### (Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"))

93.    Plaintiff restates all prior allegations as though fully pled herein.

94.    By entering into the subject transactions with Defendants involving the assignment of their military pension and/or disability pay, Plaintiff and the class members are consumers as that term is defined in Civil Code § 1761.

95.    Defendants have violated Civil Code §§ 1770(a)(5), (14) and (19), through the acts alleged herein, thereby entitling Plaintiff and members of the class to relief under Civil Code § 1780 by, inter alia:

a.    Representing that goods or services have characteristics which they do not have or that a person has a status, affiliation or connection which he or she does not have, in violation of § 1770(a)(5);

b.    Representing that a transaction confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law, in violation of § 1770(a)(14); and

c.    Inserting an unconscionable provision in a contract, in violation of § 1770(a)(19).

96.    Defendants' violations of Civil Code § 1770 described above present a continuing threat to class members and members of the public in that Defendants are continuing to engage in these practices, are continuing to refuse to refund amounts paid by consumers, and will not cease until an injunction is issued by the Court.

97.    By letter dated August 3, 2017, mailed as directed in Civil Code § 1782 and received by Defendants on August 8, 2017, Plaintiff notified Defendants of their violations of the CLRA and demanded that Defendants provide remedies to rectify their conduct.

98.    Defendants have failed to give or agree to give within a reasonable time, a sufficient remedy as set forth in California Civil Code § 1782(c) for the above-mentioned violations of law.

99.    As a direct and proximate result of the aforementioned acts, Plaintiff and each

PLAINTIFFS' CLASS ACTION COMPLAINT

member of the class he represents have suffered injury in an amount subject to proof at trial and are entitled to recover damages pursuant to California Civil Code § 1780.

100.    Plaintiff and the members of the class are entitled to an award of attorneys' fees and costs against Defendants pursuant to the provisions of Civil Code § 1780(d).

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**(Violation of the Federal Truth in Lending Act,**
**15 U.S.C. §§ 1601 *et seq*., ("TILA"))**

101.    Plaintiff restates all prior allegations as though fully pled herein.

102.    TILA and Regulation Z require that certain material disclosures be provided to a consumer before consummation of a loan contract. 15 U.S.C. § 1638(a)-(b); 12 C.F.R. § 1026.17(a)-(b), 1026.18.

103.    Among the required material disclosures in a closed-end credit transaction are the finance charge and APR. 15 U.S.C. §§ 1602(v), 1638(a)(3)-(4); 12 C.F.R. § 1026.18(d)-(e).

104.    The finance charge is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

105.    Regulation Z requires that a contract for closed-end credit disclose the finance charge, "using that term, with a brief description such as 'the dollar amount the credit will cost you.'" 12 C.F.R. § 1026.18(d).

106.    The APR is "a measure of the cost of credit, expressed as a yearly rate." 12 C.F.R. § 1026.22(a)(1); *see also* 15 U.S.C. § 1606(a).

107.    Regulation Z requires that a contract for closed-end credit disclose the APR, "using that term, with a brief description such as 'the cost of your credit as a yearly rate.'" 12 C.F.R. § 1026.18(e).

108.    The "discount," "management fee," and "account setup and servicing fee" charged by Defendants are all incident to the extension of credit and part of the finance charge required to be disclosed to consumers and included in calculation of the APR disclosed to consumers. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. §§ 1026.18, 1026.22.

109.    In the course of extending closed-end credit, Defendants used credit agreements that did not include the brief descriptions of the finance charge and APR required by Regulation Z. 12 C.F.R. § 1026.18(d)-(e).

110.    In the course of extending closed-end credit, Defendants used credit agreements that failed to disclose the finance charge and APR required by TILA and Regulation Z. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. § 1026.18(d)-(e); 12 C.F.R. § 1026.22.

111.    Defendants therefore violated TILA and Regulation Z. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. § 1026.18(d)-(e); 12 C.F.R. § 1026.22.

112.    Plaintiff and the members of the class are entitled to an award of actual damages, twice the amount of any finance charge, costs and reasonable attorney's fees pursuant to the provisions of 15 U.S.C. § 1640.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

/ / /

### SIXTH CAUSE OF ACTION
**(Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"))**
**(Against Defendant Kohn)**

113.    Plaintiff restates all prior allegations as though fully pled herein.

114.    This count is against Mr. Kohn for violation of RICO, 18 U.S.C. § 1962(c), for using Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; and Cash Flow Investment Partners, LLC, (the "Enterprise Defendants") to collect unlawful debt.

115.    RICO Section 1962(c) provides that: "It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity *or collection of unlawful debt*."[12] (emphasis added). *See United States v. Auco*in, 964 F.2d 1492, 1496-97 (5th Cir. 1992) ("It is clear to us that Congress intentionally created a statutory scheme where proof of the collection of unlawful debt is a *substitute*

---

[12] Unlawful debt" generally means a debt that is incurred or contracted in a gambling activity or business in violation of federal, state or local law or is unenforceable, in whole or in part, due to usury laws. 18 U.S.C. § 1961(6).

for a showing that appellants engaged in two or more predicate acts forming a pattern of racketeering activity.") (emphasis in original) (internal quotations and citation omitted); *see also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 652 F. Supp. 101, 103 (E.D.N.Y. 1986) (To state a claim for collection of an unlawful debt under RICO, plaintiff must show that the loan carries twice the enforceable interest rate and is incurred in connection with the business of lending money at a usurious rate).[13]

116.    Mr. Kohn is a person within the meaning of Section 1962(c).

117.    The Enterprise Defendants are enterprises within the meaning of Section 1962(c). *See Cedric Kushner Promotions, LTD., v. Don King*, 533 U.S. 158 (2001) (while the enterprise required by the statute must be more than the person operating under another name, the requisite distinctness between respondent and his corporation was established since they were legally different entities).

118.    Mr. Kohn is employed by or associated with the Enterprise Defendants. Specifically, Mr. Kohn owns 100% of the Enterprise Defendants and has complete authority, power, and discretion to make any and all decisions regarding the Enterprise Defendants.

119.    The Enterprise Defendants are engaged in interstate commerce, and their activities affect interstate commerce. Specifically, the Enterprise Defendants advertised to, solicited, and made and collected pension loans to and from pensioners across the nation.

120.    The Enterprise Defendants also use instrumentalities of interstate commerce in their daily activities, including automobiles, telephones, the internet, and the mails.

121.    Mr. Kohn conducts or participates in the affairs of the Enterprise Defendants through the collection of unlawful debt in violation of 18 U.S.C. § 1962(c). Specifically, Mr. Kohn directed the Enterprise Defendants to make and collect pension loans to and from pensioners at a rate of interest in excess of the legal rate in California.

122.    The pension loans (and the interest rates charged therein) constitute unlawful debt within the meaning of Section 1962(c) as the term is defined in Section 1961(6). Specifically,

a.    A substantial portion of the interest rate is unenforceable under state usury law. Under

---

[13] Under California law, interest will be twice the enforceable rate if it exceeds 20 percent per year. Cal. Const., Art. XV § 1.

PLAINTIFFS' CLASS ACTION COMPLAINT

California law, a lender is prohibited from charging a rate greater than 10% per annum as compensation for the use of money. Cal. Const. Art. XV, §1.

b.   The Enterprise Defendants make pension advances as part of their business. The Enterprise Defendants' practice of making usurious pension advances to veterans and other pensioners constitutes the principal portion of their business and is memorialized in their training manuals. Defendants use the pension advances as a scheme to steal income from debt-burdened veterans by charging interest rates higher than is lawfully allowed.

c.   The pension advances are issued at a rate far in excess of twice the enforceable rate allowed in California. 18 U.S.C. § 1961(6).

119.   The pension advances occur across state lines in interstate commerce as many class members, including Plaintiff, reside in different states than Defendants.

120.   Defendants attempt to collect on the pension advances by directly debiting accounts and pursuing other debt collection practices.

123.   As a direct and proximate result of the aforementioned acts, Plaintiff and each member of the class he represents have suffered injury in an amount subject to proof at trial and are entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorneys' fees, against Defendants pursuant to the provisions of 18 U.S.C. § 1964(c). *Allstate Ins. Co. v. Polack*, No. CV 08-0565 (ADS) (ETB), 2012 U.S. Dist. LEXIS 141927, at *23 (E.D.N.Y. Sep. 12, 2012) ("an award of treble damages is mandatory") (emphasis added) (*citing Cullen v. Margiotta*, 811 F.2d 698, 713 (2d Cir. 1987)) (noting that "civil RICO requires that a successful plaintiff be awarded treble damages").

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

124.   Plaintiff restates all prior allegations as though fully pled herein.

125.   Defendants, by the actions alleged above, have collected money from Plaintiff and class members under such circumstances that in equity and good conscience Defendants cannot

retain, and which in justice and fairness belongs to Plaintiff and the class.

126.    Within the last four years, Defendants have become indebted to Plaintiff and class members in the amount of all excess interest paid within that period. No part of these sums have been repaid to Plaintiff or class members.

127.    As a result of Defendants' violations, described above, Defendants have unjustly enriched themselves at the expense of the class. Defendants' unjust enrichment continues to accrue as they continue to engage in their unlawful business practices and collect loan payments and excess interest, as described above.

128.    Defendants' retention of money gained through their unlawful and deceptive practices is unjust considering the circumstances under which the funds were obtained.

129.    As a result of the foregoing, Plaintiff and the members of the class have been deprived of their money and suffered loss as alleged above.

130.    To prevent unjust enrichment, Defendants should be required to identify, account for, fully refund, and provide restitution of their ill-gotten gains including interest collected in excess of the legal maximum, and fruits of those gains, to Plaintiff and the class. Defendants should be ordered to refund all sums paid to them, together with interest thereon, and to pay reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and others similarly situated, requests and prays that this Court enter a judgment against Defendants as follows:

(a)    Certifying this case as a Class Action with Plaintiff as class representative and Plaintiff's counsel as class counsel;

(b)    Declaring the respective rights and obligations of the parties under the "Purchase and Sale Agreements";

(c)    Declaring the assignment by Plaintiff and those similarly situated of their military pensions void or voidable;

(d)    Ordering Defendants to restore to Plaintiff and class members all amounts collected

- 27 -

by Defendants which may have been acquired by means of any practices found by this Court to be illegal, unfair, or deceptive or otherwise prohibited by law;

(e)     Permanently enjoining Defendants from taking any assignment of the disability payments of any veteran and the pension benefits of any enlisted veteran;

(f)     Awarding treble damages in amounts to be proven at trial;

(g)     Awarding treble the amount of all excess interest paid to Defendants within the past year prior to the filing of this Complaint;

(h)     Awarding pre-judgment interest on all other amounts awarded;

(i)     Awarding costs and attorneys' fees as authorized by law; and

(j)     Granting such other and further relief as may be deemed just and proper in the premises.

## IX.     JURY DEMAND

Plaintiff, JOHN UNDERWOOD, individually and on behalf of all others similarly situated, by and through his attorneys, hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided with respect to the above-entitled cause.

DATED: September 11, 2017                    Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By: /s/ Jeffrey R. Krinsk_____

Jeffrey R. Krinsk, Esq.
Trenton R. Kashima, Esq.
David J. Harris, Esq.
550 West C St., Suite 1760
San Diego, CA 92101
Telephone:  (619) 238-1333
Facsimile:   (619) 238-5425

Lance C. Young (will pro hac vice)
Amy L. Marino (will pro hac vice)
Rod M. Johnston (will pro hac vice)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, MI 48076
Phone: (248) 355-0300

- 28 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

lyoung@sommerspc.com
amarino@sommerspc.com
rjohnston@sommerspc.com

Jason T. Brown (will pro hac vice)
Nicholas Conlon (will pro hac vice)
Alexander B. Imel (will pro hac vice)
JTB LAW GROUP, L.L.C.
155 2nd Street, Suite 4
Jersey City, NJ 07302
Phone: (201) 630-0000
Fax: (855) 582-5297
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com
alec.imel@jtblawgroup.com

*Attorneys for Plaintiff
and the putative class*

PLAINTIFFS' CLASS ACTION COMPLAINT