Jeffrey R. Krinsk, Esq.  (SBN109234)
jrk@classactionlaw.com
Trenton R. Kashima, Esq. (SBN 291405)
trk@classactionlaw.com
FINKELSTEIN & KRINSK LLP
550 West C Street, Ste. 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Plaintiff
and the Putative Class*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **JOHN UNDERWOOD** and **JOHN DRISCOLL**, on behalf of themselves and all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>**FUTURE INCOME PAYMENTS, LLC; PENSIONS, ANNUITIES AND SETTLEMENTS, LLC; CASH FLOW INVESTMENT PARTNERS, LLC; AND SCOTT A. KOHN**,<br><br>    Defendants. | Case No: 8:17-cv-01570-DOC-DFM<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>Hon. David O. Carter<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

- 1 -

Plaintiff, by their attorneys, on behalf of themselves and all others similarly situated, makes the following allegations pursuant to the investigation of their counsel and based on information and belief, except as to allegations pertaining to personal knowledge as to themselves.

## I.      NATURE OF THE ACTION

1.      This is a class action against Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; Cash Flow Investment Partners, LLC; and Scott A. Kohn (collectively, "Defendants" or "FIP") concerning Defendants' unlawful marketing, lending, and collection practices.

2.      Plaintiff John Underwood ("Mr. Underwood") is a retired and disabled veteran of the United States Air Force.  Plaintiff John Driscoll ("Mr. Driscoll") is a retired veteran of the United States Army. Together, Plaintiffs bring this action on behalf of themselves and others similarly situated stating claims for (1) Declaratory Relief, Code of Civil Procedure § 1060, (2) the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, (3) the California Usury Law, Stats. 1919, p. lxxxiii, Deering's Uncod. Initiative Measures & Stats. 1919-1, (4) the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, (5) the Federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (6) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and (7) unjust enrichment. All of these causes of action arise from Defendants' pattern and practice of entering into transactions with retired and/or disabled veterans that contain numerous unconscionable and otherwise unenforceable provisions, and which are disguised loan transactions bearing usurious effective interest rates. Further, in connection with such transactions, Defendants' documents purport to obtain, in effect, assignment of retired military benefits, which are unenforceable in light of the anti-assignment provisions found at 37 U.S.C. § 701(c) and 38 U.S.C. § 5301(a)(1), (3).

3.      Defendants are engaged in the business of entering into loan transactions, which they call "Purchase and Sale Agreements," with retired and/or disabled veterans. *See generally* Declaration of Isabelle L. Ord [Dkt. No. 30-2], Ex. A. Under the terms of these contracts, Defendants loan the veteran a sum of money in exchange for a promise by the veteran to make future payments secured by the veteran's military retirement or disability payments. *Id.* Defendants attempt

- 2 -

to disguise the nature of these transactions by inserting into their form contracts a clause stating that the transaction "is not a loan or assignment." *Id.* However, the transactions are—in substance and by law—loans from Defendants to the veteran and an assignment of their military benefits.

4.      Regulators for the States of California, New York, Massachusetts, Iowa, Washington, North Carolina, Colorado, Pennsylvania, and Minnesota and the City of Los Angeles have all determined that Defendants' products *are loans*.[1]

5.      The terms of these loans are usurious and otherwise unfair and unlawful. For example, the imputed interest rate on the transaction between Defendants and Mr. Underwood is 41.422%, which far exceeds the applicable usury limit. *See* Art. XV, Sec. 1, of the California Constitution.[2]

6.      The assignment of military pension pay of enlisted military personnel upon retirement is prohibited by 37 U.S.C. § 701(c). Similarly, the assignment of disability benefits to all military veterans regardless of rank is illegal under 38 U.S.C. § 5301(a)(1) and (a)(3)(A) and (C). The contract between Defendants and Mr. Underwood, and the similar contracts between Defendants and the class members, effectively purport to obtain an illegal assignment of retired military pension and disability benefits in violation of these provisions. As a result, these contracts are void as a matter of law.

7.      In addition, Defendants' practices of requiring Plaintiff and class members to assign their military benefits in violation of federal law, and their representations intended to induce veterans to enter into these contracts and assign their benefits, constitute unfair, deceptive, and unconscionable acts or practices in the conduct of business, trade, or commerce, and are barred by

---

[1] *See, e.g.*, David Lazarus, "'Pension Advance' Company is Unmasked—And It's No Friend of California Consumers," LA Times (Mar. 14, 2017), *available at* http://www.latimes.com/business/lazarus/la-fi-lazarus-cfpb-future-income-payments-20170317-story.html; Mark Brunswick, "Minnesota attorney general sues companies that allegedly bilked veterans and seniors," Star Tribune (Aug. 17, 2017), *available at* http://www.startribune.com/minnesota-ag-sues-companies-that-allegedly-bilked-veterans-and-seniors/440766003/.

[2] "Generally, the California Constitution sets a maximum annual interest rate of seven percent on loans and forbearances, but allows parties by written contract to set the interest rate at up to 10 percent . . . ." *WRI Opportunity Loans II LLC v. Cooper*, 154 Cal. App. 4th 525, 533, 65 Cal. Rptr. 3d 205 (2007) (citations and quotations omitted).

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

state law.

## II.    JURISDICTION AND VENUE

8.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1331 because one or more of the claims arise under the laws of the United States. Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and (2) at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

9.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject matter jurisdiction as to state law claims not covered by 28 U.S.C. § 1332.

10.     Personal jurisdiction is proper because a substantial part of the events or omissions giving rise to the claims occurred in the State of California: Defendants advertised to, solicited, and made and collected pension loans to and from pensioners, including Plaintiff, from Defendants' California headquarters. Moreover, the contractual documents prepared by Defendants and entered into by Plaintiffs and the class members specify that the state or federal courts located in California shall have non-exclusive jurisdiction to hear and determine any claims or disputes pertaining or relating to the agreements.

11.     Personal jurisdiction is also proper because Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; and Cash Flow Investment Partners, LLC ("LLC Defendants") maintain a principal place of business at 18300 Von Karman Ave., Suite 410, Irvine, CA 92612 and maintain a registered agent, Scott Kohn, at 3535 E. Coast Highway #119, Corona Del Mar, CA 92625. All located within this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because all LLC Defendants are subject to Personal Jurisdiction in this District and the individual defendant—Scott Kohn—resides in this district.

13.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Moreover, the contractual documents prepared by Defendants and entered into by Plaintiffs and the

- 4 -

class members specify this Court as a proper venue for litigating issues pertaining to the terms of those documents.

### III.    PARTIES

14.    Plaintiff John Underwood is a retired enlisted military veteran residing in Otway, Ohio. Mr. Underwood retired from the United States Air Force as a Master Sergeant in 2010 after 23 years of military service with a retirement income of $2,053 per month.

15.    Plaintiff John Driscoll is a retired enlisted military veteran residing in Gilchrist, Oregon. Mr. Driscoll retired from the United States Army in 2013 with a retirement income of $3,534.00 per month.

16.    Defendant FIP is a Delaware limited liability company with its principal place of business, as registered with the Nevada Secretary of State, at 2505 Anthem Village Dr., Ste E-599, Henderson, Nevada 89052 and its principal place of business, as registered with the California Secretary of State, at 18300 Von Karman Ave., Suite 410, Irvine, CA 92612. FIP was formed in April 2011 and has conducted business from 18300 Von Karman Ave., Suite 410, Irvine, California 92612, and from 3535 East Coast Highway, #119, Corona del Mar, California 92625.

17.    FIP formerly did business as Pensions, Annuities & Settlements, LLC.

18.    When Pensions, Annuities & Settlements, LLC, changed names to FIP in 2011, FIP assumed all of Pensions, Annuities & Settlements, LLC's debts, obligations, rights, and liabilities.

19.    FIP actively collected the loan repayments for loans entered into under its prior entity, Pensions, Annuities & Settlements, LLC.

20.    FIP is Pensions, Annuities & Settlements, LLC's successor and liable for all allegations in this complaint that apply to Pensions, Annuities & Settlements, LLC.

21.    FIP has or had the following marketing affiliates, all operating out of 18300 Von Karman Ave., Suite 410, Irvine, California 92612: Cash Flow Investment Partners, LLC (http://www.lumpsum-settlement.com); BuySellAnnuity, Inc. (http://www.buysellannuity.com); and Pension Advance, LLC.

22.    FIP's business model is to solicit pensioners through the websites of its marketing affiliates and enter into contracts with pensioners in which pensioners receive a lump sum of money

in exchange for some or all of the pensioners' monthly pension payments for a fixed period of time, generally five to ten years. FIP also enters into contracts with investors, who provide money for the lump sum cash payments and receive some or all of pensioners' monthly pension payments.

23.     FIP and its marketing affiliates operate as a single integrated enterprise and are all jointly and severally liable for the allegations in this complaint.

24.     Defendant Scott A. Kohn is an individual who owns 100% of FIP and is its President, Secretary, and Treasurer. Mr. Kohn is FIP's sole Member, as defined in FIP's articles of formation, and as such has complete authority, power, and discretion to make any and all decisions regarding FIP. Mr. Kohn is also the sole owner of FIP's affiliated marketing entities, Cash Flow Investment Partners, LLC; BuySell Annuity, Inc.; and Pension Advance, LLC.

25.     At all relevant times alleged in this matter, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency regarding the acts and omissions alleged and are thus jointly and severally liable for the allegations in this complaint.

## IV.     BACKGROUND

### A.     Military pension scams are stealing income from debt-burdened veterans

26.     In May 2003, the National Consumer Law Center, Inc. ("NCLC")[3] was researching consumer scams perpetrated on active military personnel and ultimately issued a report entitled *In Harm's Way-At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans*.[4]   While not the primary focus of the investigation, the report disclosed that the Judge

---

[3] NCLC is a non-profit Massachusetts Corporation, founded in 1969, specializing in low-income consumer issues, with an emphasis on consumer credit. On a daily basis, NCLC provides legal and technical consulting and assistance on consumer law issues to legal services, government, and private attorneys representing low-income consumers across the country. NCLC publishes a series of twenty practice treatises on consumer credit laws, including Unfair and Deceptive Acts and Practices (8th Ed., 2012), updated at www.nclc.org/library, and Cost of Credit: Regulation, Preemption, and Industry Abuses (4th Ed., 2009), updated at www.nclc.org/library, as well as periodic reports on a range of topics related to consumer credit issues and low-income and elderly consumers. NCLC attorneys have written and advocated extensively on all aspects of consumer law affecting low-income and elderly people, conducted training for thousands of legal services and private attorneys on the law and litigation strategies to deal with predatory lending, unfair debt collection practices, and other consumer law problems, and provided extensive oral and written testimony to numerous Congressional committees on these topics.

[4] https://www.nclc.org/images/pdf/special_projects/military/report-scams-facing-military.pdf

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

Advocate General Corps felt that some of the greatest abuses they were seeing concerned the solicitation of retired military personnel to gain access to their pension payments.

27.   NCLC discovered that companies and individuals were targeting veterans' benefits, usually by offering an up-front cash payment in return for several years of the veteran's monthly benefit, thus creating a growing threat to elder veterans and their dependents. These schemes produced huge profits for the scammers, deprived veterans of funds they needed for their long-term financial security, and, NCLC contended, were illegal.

28.   Veterans receiving retirement and disability benefits are highly attractive targets for financial exploitation:

• Retirement and disability benefit payments are regular, very dependable, and long-term. Furthermore, it is very easy to arrange automatic transfer of the funds each month through "allotments" set up through the Defense Finance and Accounting Servicer. A company that can convince a veteran to sign over rights to his or her pension payments, and can enforce such an agreement, faces an extremely low risk of non-payment. The companies often reduce this risk even further by requiring the veteran to buy life insurance and designate the company as the beneficiary.

• Veterans are easy to reach through affinity marketing and advertising in targeted publications such as the Military Times Network. Although these publications are produced by a private, for-profit corporation, many service members and veterans perceive them to be "official" and assume that advertisers are screened or approved in some way. The companies may also use the internet, relying upon lead generators, referral networks, and commissions to reach more potential victims.[5]

• Veterans may have, or perceive themselves to have, unusually heavy debt burdens or poor credit as a result of the financial strains of deployments, frequent relocations,

---

[5] The then-homepage of Veterans First Financial Services was highlighted in the Harm's Way report. The advertisement featured an undulating American flag and, at the top, an eye-grabbing, full-color display of military insignias in motion across the screen. A three-part message flashed over those insignias: "You've worked hard—invest your money the way YOU want—If you're a retired veteran, VFFS, Inc. can help!"

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

and other challenges of military service. Veterans, many of whom enlisted at a young age, may also be less familiar with the landscape of legitimate lenders and financial institutions.

29.     A number of companies targeted military veterans by offering lump sums in exchange for the veteran's promise to redirect monthly benefits payments directly to the company for a fixed number of years. The cost of these transactions can be astronomically high: NCLC has found agreements with effective APRs of 27% all the way up to 106%. These typically are not small-dollar transactions – the agreements NCLC has examined involved principal amounts that sometimes exceed $100,000, and on average fall in the range of $40,000-$55,000.

30.     The companies try to characterize the transactions as sales or assignments rather than loans for two reasons. First, as the owner of one such company admitted in a deposition, they want to make the transaction non-dischargeable in bankruptcy. Where a true assignment or sale has taken place, the purchaser may have a property interest in the income stream that is unaffected by bankruptcy; in other words, the obligation effectively cannot be discharged by the veteran. Second, the companies want to avoid disclosure requirements and usury limits imposed by state law.

## V.     <u>SUBSTANTIVE ALLEGATIONS</u>

### A.     **Advertising and solicitation**

31.     During the relevant period, FIP advertised to and solicited pensioners across the nation—including in California—through its marketing affiliates' websites and other websites.[6]

32.     FIP advertised its product as a way for pensioners to obtain cash quickly to meet their immediate needs and long-term goals. Calling the product a "lump sum," "pension buyout," and/or "pension advance," FIP's websites stated that it accepted most types of pension payments, including pensions from private companies, state or federal government pensions, military pensions, fire and police department pensions, and teachers' pensions.

33.     FIP also received referrals from other pension lenders and bought consumer leads from websites similar to its own websites.

---

[6] For general background on FIP's business practices, *see, e.g.*, *In re. Future Income Payments, LLC*, NY Dept. Fin. Servs. (Oct. 20, 2016) (Consent Order), *available at* http://www.dfs.ny.gov/about/ea/ea161020.pdf.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

34.     FIP paid third parties to steer internet-search traffic to its websites, including a website with the uniform resource locator "http://www.lumpsum-pensionloans.com," by targeting consumers who conducted searches for FIP-approved phrases such as "personal loans," "pension loan," "on line loan," or "military retirement loan," among others.

35.     Nevertheless, FIP instructed its employees to avoid any mention of loans. Its telephone marketing script for inbound calls from interested consumers warned employees that "saying or mentioning 'Pension Loan' or the word 'loan' is an autofail."[7]

36.     In addition, the FIP product training manual stated that FIP purchases "future pension payments, and pay[s] sellers a lump sum in exchange for those payments" and that its product "is not a loan or assignment," but acknowledged that "the IRS views it similar to a loan."[8]

37.     Despite this training and FIP's characterization of its products as sales in its online advertising and promotional materials, between 2011 and the present date, some FIP employees referred to FIP's product as a loan when communicating with consumers. For example, in a 2016 investigation of FIP, the New York State Department of Financial Services discovered the following: instances of FIP employees introducing themselves as calling from "Pension Loans" or "Lumpsum Pension Loans"; using email addresses with the domain name of "@lumpsum-pensionloans.com"; at least one employee referring to a consumer's "loan application" when communicating with the consumer; and another employee instructing a consumer to submit certain documents "to make the loan possible."[9]

38.     Consumers referred to the product as a loan and FIP as a lender in their communications with FIP. FIP only occasionally corrected consumers who used such terminology.

**B.     Pension loan offer**

39.     Consumers contacted FIP through its websites or by phone to obtain a quote and begin the application process. Representatives of FIP communicated with pensioners by phone, letter, or email to provide a quote for the loan amount and begin collecting information and

---

[7] *Id.* at ¶ 7.
[8] *Id.* at ¶ 8.
[9] *Id.* at ¶ 9.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

documents from the pensioner to allow FIP to complete the underwriting process.

40.     Pensioners were asked to submit a number of documents relating to their pension and financial situation, as well as documents evidencing their identity and marital status, to undergo a credit check and bankruptcy review, and to answer certain questions regarding their medical history. Many pensioners were asked to submit proof of life insurance as well.

41.     After verifying the pensioners' information and deciding to extend an offer, FIP proposed to pensioners a lump sum of cash in exchange for a specified amount of the pensioners' monthly pension payments.

42.     To complete the loan process, FIP required pensioners to complete and sign several documents provided by FIP in what FIP referred to as the "Seller Packet." FIP used several versions of the documents in the Seller Packet during the relevant period.

43.     The Seller Packet consisted of approximately nine documents: (1) a contract entitled "Future Income Stream Purchase and Sale Agreement," "Buyer and Pensioner Purchase Agreement for Purchase of Future Income Stream," or "Future Income Payment Purchase and Sale Agreement"; (2) Transaction Details; (3) Authorization for Automatic Payments; (4) Disclosures and Acknowledgments; (5) Certificate of Marital Status; (6) Security Guaranty and Indemnification Agreement; (7) Purchase Agreement; (8) Employment Verification Form; and (9) W9-Request for Taxpayer Identification Number and Certification.

44.     In addition, depending on which version of the agreement was used, pensioners were asked to submit some or all of the following documents: (1) proof of life insurance policy with death benefits amount; (2) collateral assignment form assigning the life policy benefits to a FIP-designated assignee; (3) letter from the pensioner's pension payor confirming pension eligibility, amount, and term; (4) photographic identification, usually a driver's license; (5) voided check; (6) if previously married, a marital support document; (7) if the pensioner was self-employed, a copy of his or her personal or corporate tax return; and (8) a bill showing telephone or cellular phone details.

45.     Once FIP received and verified all documents, pensioners executed a loan agreement with FIP.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

### C.     The loan agreement

46.     FIP's loan agreement provided that the pensioner would receive a "one-time, lump sum payment" in exchange for a specified amount of the pensioner's monthly pension for a specified number of months.

47.     Although the agreements were between FIP and pensioners, the agreements provided that FIP intended to sell and would sell the monthly pension payments remitted by pensioners and assign FIP's rights under the agreement to third parties. These third parties were the investors who provided the lump sum funds that were paid to pensioners.

48.     The transactions contractually obligated pensioners to repay the lump sum loan amounts by monthly payments over the term set by the loan agreement.

49.     Until 2015, the pensioners personally guaranteed repayment of the lump sum loan amounts and monthly installment payments over the term set by the loan agreement.

50.     Upon receipt of the lump sum amount into the pensioners' own bank accounts, the pensioners instructed the bank or financial institution at which their pension payments were deposited to transfer a specified amount of the pensions into a FIP-controlled account. To facilitate collection of the obligated payments, pensioners executed an authorization for electronic funds transfer granting FIP the power to collect the monthly pension installment payments from the pensioners' accounts.

51.     Many pensioners also used credit or debit cards to make their monthly payments.

52.     FIP deducted $300 from the lump sum amount as an account set-up fee and servicing fee, and until September 2014 charged pensioners a "Management Fee" of $10 per month for "services rendered in connection with the collection of cash flows."

53.     FIP's contracts with investors provided that pensioners would remit their monthly pension payments to a FIP master account, called the "Payment Account," and FIP would thereafter remit the payments to the investor. The investor contracts did not include any information regarding the set-up and management fees FIP charged pensioners and took from their lump sum and monthly installment payments.

54.     Although FIP's agreements referred to the transaction as a "sale" or "valid sale" and

- 11 -

stated that the product is not a loan, the transaction lacked features of a sale, such as notification to third parties or the transfer of tax liability to the "purchaser." Rather, the transactions had all the indicia of a loan. For instance:

     a.   The agreements provided for an advance of money to pensioners and, conditioned only on the failure of their pension payor to continue making payments, pensioners' promise to repay in installments over a period set by the agreements.

     b.   The agreements acknowledged that the lump sum amount was "significantly less" than the amount that the pensioner would pay under the agreement, and some stated the difference between the amount pensioners received as a lump sum and the amount they would have collected and retained if the transaction with FIP had not taken place. This difference, referred to in the agreements as the "discount," was, in fact, the interest that the pensioner paid over the course of the loan. The APR, however, was not disclosed.

     c.   Prior to extending the loan, FIP reviewed the borrower's credit risk and engaged in standard loan underwriting assessment. For example, in order to obtain the loan approval, the borrower was required to verify the amount of his or her retirement or disability benefits by supplying FIP with income tax returns, pay checks or stubs, and evidence of other income and financial status. After receiving verification of the prospective borrower's income and the other financial information, FIP provided the loan documents to the prospective borrower.

     d.   In the agreements, FIP reserved a security interest in the pensioner's retirement or disability benefits. In essence, Defendants paradoxically claim they purchase the pensioner's benefits and also have a security interest in these benefits.

     e.   Pensioners were required to personally guarantee repayment of the lump sum and monthly installment payments.

     f.   The loan agreements had stringent recourse provisions in the event a pensioner failed to make the monthly payments: any disruption, interruption, decrease, or elimination of payments was deemed a material breach of the contract and caused all remaining

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

1      and unpaid payments to be immediately due and payable.

2        g.    The agreements also provided that any breach could require a pensioner to pay FIP's

3      and any subsequent purchasers' legal fees and costs incurred pursuing a claim against

4      the pensioner.

5        h.    Pensioners who failed to make timely payments were charged late fees equal to 1.5%

6      of the delinquent payment. Payments returned to FIP for insufficient funds resulted in

7      a $55 fee, in addition to any late fees.

8      55.    Some of the agreements FIP entered into with pensioners contained provisions stating

9 that any "intentional violation" of the pensioner's obligations under the contract that "deprived [FIP]

10 of the economic benefits contemplated by this agreement could under certain circumstances,

11 constitute criminal conduct, punishable by criminal fines or imprisonment."

12      56.    The agreements FIP entered into with pensioners contained numerous other

13 provisions which are unconscionable, illegal, or otherwise unenforceable, including language

14 purporting to:

15        a.    illegally bind borrowers' heirs;

16        b.    effect a waiver of certain legal remedies and rights; and

17        c.    exclude the borrower's obligations under the agreement and the security interest

18      granted therein from the borrower's bankruptcy estate.

19      57.    The agreements FIP entered into with pensioners contained a choice-of-law provision

20 that specifically selects California law to govern the agreements.

21        **D.**    **FIP kicked out of California and charged with predatory lending**

22      58.    FIP maintained its principal place of business in Irvine, California, until the

23 California Commissioner of Business Oversight ("Commissioner") issued a March 3, 2015 cease-

24 and-desist order, charging that the company was issuing loans without a license in violation of

25 California Financial Code Section 22100, *et seq*. The Commissioner ordered FIP to desist and refrain

26 from engaging in the business of a finance lender or broker in the State of California without first

27 obtaining a license from the Commissioner or otherwise being exempt. "[FIP] insisted that they

28 weren't making loans, that what they were offering were 'sales agreements,'" said Tom Dresslar, a

- 13 -

spokesman for the California Department of Business Oversight. "That was wrong. They were loans."[10]

59.     In February 2017, Los Angles City Attorney Mike Feuer ("City Attorney Feuer") filed suit against FIP, alleging that the company "charged interest rates as high as 96%, far above California's 10% usury limit, and threatened borrowers, falsely, that defaulting on the loans could subject them to criminal liability." In a statement, City Attorney Feuer called this "predatory lending" and said that such practices "can exploit the very real financial struggles of California's most vulnerable residents, including seniors and veterans."[11]

60.     According to the lawsuit, FIP also subjects pensioners in default to illegal and harassing debt collection practices, such as repeated telephone calls starting as early as 5:30 a.m. In addition, the lawsuit alleges that FIP solicits California investors to invest in underlying pension loans, but fails to disclose material information and makes material misrepresentations. For example, the lawsuit alleges that FIP affirmatively assures investors (falsely) that the pension loans comply with all applicable laws. As a result, investors unknowingly bear the risk of loss on loans which are legally challenged or deemed void.

61.     City Attorney Feuer seeks, among other things, an injunction prohibiting FIP from collecting on the predatory loans issued to California pensioners, as well as selling unlawful and fraudulent loans to California investors. In addition, City Attorney Feuer seeks restitution for pensioners, as well as civil penalties.

### E.     FIP shut down in New York and forced to repay

62.     In 2016, the New York State Department of Financial Services (the "Department") commenced an investigation to determine whether FIP violated New York Banking and Financial Services Laws by lending without a license, making usurious loans, conducting money transmitting without a license, and making intentional misrepresentations regarding a financial product or service

---

[10] David Lazarus, "'Pension Advance' Company is Unmasked—And It's No Friend of California Consumers," LA Times (Mar. 14, 2017), *available at* http://www.latimes.com/business/lazarus/la-fi-lazarus-cfpb-future-income-payments-20170317-story.html.
[11] http://www.lacityattorney.org/single-post/2017/02/16/City-Attorney-Mike-Feuer-Sues-to-End-Allegedly-Predatory-Pension-Loan-Business.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

in the State of New York. The Department concluded that:

    a.    FIP entered into loan agreements pursuant to which New York pensioners borrowed a lump sum of money in exchange for some or all of the pensioner's monthly pension payments;

    b.    FIP made loans in New York State without a lending license;

    c.    FIP charged a rate of interest on the loans they entered into with New York pensioners that exceeded the rate permitted by New York Banking and General Obligations Laws;

    d.    FIP transmitted money to and from New York State without a money transmitter license; and

    e.    FIP misrepresented to New York pensioners the legal status of the transactions by mischaracterizing the loans as sales of an asset, misrepresenting the interest charged by calling it a discount, and omitting the APR.

63.    On October 20, 2016, the Department and FIP entered into a Consent Order ("Order"), requiring FIP to pay a $500,000 civil penalty to the Department, cease all consumer-related transactions within New York State or with any New York resident, and refrain from participating in any money-transmitting activity in New York State except to the extent required to fulfill their obligations pursuant to the Order.

64.    The Order further required FIP to reform the agreements previously entered into with New York pensioners as follows:

    a.    The total amount owed for each agreement shall be revised to equal only the lump sum advanced;

    b.    The reformed agreements shall reflect that pensioners shall have no further payment obligation beyond the lump sum amount set forth in their agreements;

    c.    All payments already made by New York pensioners shall be applied to the lump sum amounts; and

    d.    FIP will forgive all amounts due ($6,348,232 across 292 transactions) in excess of the amount advanced.

- 15 -

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

## VI.   ALLEGATIONS RELATING TO PLAINTIFF MR. UNDERWOOD

65.     Plaintiff John Underwood is a resident of Scioto County, State of Ohio.

66.     Mr. Underwood served for 23 years in the United States Air Force, attaining the rank of Master Sergeant.

67.     In 2010, Mr. Underwood retired from the U.S. Air Force.

68.     Sometime thereafter, Mr. Underwood saw an advertisement placed by FIP through a Google search advertising a way for military personnel to obtain cash advances.

69.     In approximately December 2012, Mr. Underwood contacted Pensions, Annuities, and Settlements, LLC, and the parties began to correspond regarding Defendants providing upfront cash to Mr. Underwood in exchange for his payment of a substantially larger amount over time. After eliciting information regarding Mr. Underwood's military retirement benefits, checking his credit, and obtaining other underwriting information, Defendants informed Mr. Underwood that FIP would provide him $10,000.00 in cash, less a $300 setup fee, in exchange for, among other things, Mr. Underwood's promise to pay to FIP $397 per month for 60 months.

70.     On or about December 19, 2012, Mr. Underwood was electronically forwarded a document titled, "Future Income Stream Purchase and Sale Agreement" (the "Agreement") by Pensions, Annuities and Settlements, LLC, which provided for the exchange of upfront cash for payments over time as described in the previous paragraph above. Defendants' representative contacted Mr. Underwood over the telephone and instructed him to scroll to appropriate pages within the document to sign and initial electronically. Said representative warned Mr. Underwood that he had to complete the document immediately to receive payment. Following Defendants' instructions, Mr. Underwood executed the Agreement on or about December 19, 2012 without fully reviewing its terms. The document closed after execution, preventing Mr. Underwood from retaining a copy. Defendants' representative promised Mr. Underwood that a copy of the Agreement would be emailed to him. However, Mr. Underwood did not receive an email containing a copy of the Agreement. This Agreement required Mr. Underwood to instruct the bank or financial institution to which his pension and disability payments are paid to forward monthly payments in an amount equal to $397 to an account established by Defendants. The Agreement purported to waive Mr.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

Underwood's right to redirect such payments to any other destination and included severe penalties should Mr. Underwood so direct any such payments.

71.     The gross loan proceeds from the above-described transaction was $10,000.00. In addition, Mr. Underwood had to pay a one-time $300 account setup and servicing fee—which was withheld from the gross loan proceeds of $10,000.00—and a $10 monthly management fee.

72.     Mr. Underwood thus received $9,700.00 ($10,000 less $300) as net loan proceeds. For such loan, Mr. Underwood was required to assign a portion of his military and disability pension in the amount of $397 per month for 60 months. To date, Mr. Underwood has already paid Defendants at least $20,644 in pension payments that includes $520 in monthly management fees.

73.     Over the term of the loan, Mr. Underwood would repay $23,820.00 (not including setup fees). The imputed interest rate on such a loan is 41.422%. If an event occurred which resulted in accelerated payment, such as a material breach of the Agreement, the imputed interest rate would be even higher.

74.     Mr. Underwood relied on the representations made by Defendants, as alleged herein, and was injured as a result. For example, Mr. Underwood relied on the representation that the Agreement was not a "loan or assignment."  Additionally, FIP failed to disclose material information from Mr. Underwood, such as the fact that assignment of his military pension and/or disability benefits is expressly prohibited by federal law. Based on Defendants' misrepresentation and/or omissions, Mr. Underwood was injured as a result from being charged a higher interest rate than would otherwise be allowable under California law and having his military pension and/or benefits unlawful assigned. Had Mr. Underwood known the true nature of the transactions, he would not have entered in to the Agreement.

**VII.    ALLEGATIONS RELATING TO PLAINTIFF MR. DRISCOLL**

75.     Plaintiff John Driscoll is a resident of Klamath County, State of Oregon.

76.     Mr. Driscoll served for 25 years in the United States Army, attaining the rank of E-8 Master Sergeant.

77.     On October 31, 2013, Mr. Driscoll retired from the U.S. Army.

78.     Between approximately May and June 2015, Mr. Driscoll inquired about Defendants'

services. On or about July 14, 2015, Mr. Driscoll was electronically forwarded a document titled, "Future Income Stream Purchase and Sale Agreement" (the "Agreement") which provided for the exchange of upfront cash for payments over time. Defendants' representative contacted Mr. Driscoll over the telephone and instructed him to scroll to appropriate pages within the document to sign and initial electronically. Said representative urged Mr. Driscoll to complete the form promptly in order to receive payment. On or about July 14, 2015, Mr. Driscoll executed the Agreement. The Agreement required Mr. Underwood to instruct the bank or financial institution to which his pension payments are paid to forward 60 monthly payments in an amount equal to $1,000.00 to an account established by Defendants. In exchange, the Agreement stated that FIP would provide Mr. Driscoll $31,504.00, after a $300 setup fee deduction. The Agreement purported to waive Mr. Driscoll's right to redirect such payments to any other destination and included severe penalties should Mr. Driscoll so direct any such payments.

79.     Mr. Driscoll thus received $31,504.00 as net loan proceeds. For such loan, Mr. Underwood was required to assign a portion of his military and disability pension in the amount of $1,000.00 per month for 60 months. To date, Mr. Driscoll has already paid Defendants approximately $33,000.00.

80.     Over the term of the loan, Mr. Driscoll would repay $60,000.00. The imputed interest rate on such a loan is 29%. If an event occurred which resulted in accelerated payment, such as a material breach of the Agreement, the imputed interest rate would be even higher.

81.     Mr. Driscoll relied on the representations made by Defendants, as alleged herein, and was injured as a result. For example, Mr. Driscoll relied on the representation that the Agreement was not a "loan or assignment."  Additionally, FIP failed to disclose material information from Mr. Driscoll, such as the fact that assignment of their military pension benefits is expressly prohibited by federal law. Based on Defendants' misrepresentation and/or omissions, Mr. Driscoll was injured as a result from being charged a higher interest rate than would otherwise be allowable under California law and having his military pension benefits unlawful assigned. Had Mr. Driscoll known the true nature of the transactions, he would not have entered in to the Agreement.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

## VIII.   DISCOVERY RULE AND TOLLING ALLEGATIONS

82.     As noted above, Defendants misrepresented that their "Future Income Stream Purchase and Sale Agreement" was a not a loan and, therefore, was not subject to a litany of federal and state consumer protection laws. Defendants, similarly, misrepresented that the "Future Income Stream Purchase and Sale Agreement" was a not an assignment of the class's military benefits, to avoid statutory protections for retired and disabled military personal. Nevertheless, Defendants transaction was both a loan, and an assignment, that targeted veterans and their benefits. Defendants' misrepresentations were designed and implemented to conceal their unlawful conduct.

83.     The true nature of Defendants' "Future Income Stream Purchase and Sale Agreements" was difficult for members of the class to discover.  The target of Defendants' scheme, veterans, are a vulnerable class of individuals which may have, or perceive themselves to have, unusually heavy debt burdens or poor credit as a result of the financial strains of their military service.  Veterans, many of whom enlisted at a young age, may also be less familiar with the landscape of legitimate financial products.  Disabled veterans are particularly vulnerable due to the extra financial burdens associated with medical bills and diminished job prospects.  This is particular true of the Class, who were targeted by Defendants because they were in need of 'quick' money.  Therefore, members of the Class had few resources to investigate Defendants' contracts.[12]

84.     But even if Defendants had not targeted veterans, a reasonable consumer would be unable to immediately discern the true nature of Defendants' transaction.  The technical and legal differences separating a "loan" or "assignment" from a "sale" of a financial asset are not common knowledge.  Instead, as noted by the Supreme Court, consumers reasonably rely on businesses to accurately describe their transactions:

> The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious. The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of caveat emptor should not be relied upon to reward fraud and deception.

---

[12] Indeed, because of these vulnerabilities, both California and federal law provide extra financial protections for veterans, as noted herein.

*FTC v. Standard Education Soc.,* 302 U.S. 112, 116 (1937). Thus, consumers are not required to look beyond Defendants' representations, and conduct their own research, to determine proper legal classification of Defendants' "Future Income Stream Purchase and Sale Agreements."[13]

85.   On the other hand, Defendants are sophisticated business persons or entities (with multiple employees) involved in providing financial products and services to consumers and investors. Defendants drafted the contracts in question and presented the "Future Income Stream Purchase and Sale Agreements" to veterans on a take-it-or-leave-it basis. Because Defendants controlled the terms of their "Sale Agreements," and had the resources and duty to research the legality of their own transactions, Defendants were in a far superior position to comprehend their own financial offerings. *See* Cal. Mil. & Vet. Code § 870 (prohibiting any person from "advertis[ing], offer[ing], or enter[ing] into an agreement with a pension beneficiary that would involve an assignment of [veteran] pension benefits that is prohibited by state or federal law."). Defendants did everything they could to present themselves as a legitimate business, and Plaintiffs and the class had no immediate cause to question the *bona fides* of Defendants' financial products.

86.   Defendants also deliberately undermined Mr. Underwood's ability to discover the illegal nature of Defendants' transactions.  As alleged above, Defendants' representatives engaged in high-pressure tactics to persuade Mr. Underwood to execute the Agreement without thorough review of its terms. Thereafter, Defendants failed to provide Mr. Underwood with a copy of the Agreement. In the years after executing the agreement, Mr. Underwood contacted Defendants multiple times to request a copy of the Agreement, his balance statement, and other information pertaining to his obligations to Defendants. In response, Defendants' employees repeatedly claimed that they were unable to assist Mr. Underwood, and referred him to other employees in a circular fashion.

87.   It was not until late 2015 that Defendants finally mailed Mr. Underwood a copy of his original executed Agreement. In the summer of 2017, Mr. Underwood showed the Agreement to his bankruptcy attorney, who remarked that the Agreement's terms were unusual. Mr. Underwood then

---

[13] Defendants sold the income derived from the "Future Income Stream Purchase and Sale Agreements" to investors.  If private investors, who are often more knowledgeable about different financial products (and aided by investment brokers or other professions) were misled, in its reasonable that normal consumers would not be able to discover Defendants' scheme.

researched Defendants on the Internet and found several veterans' interest websites describing Defendants' illegal scheme, and thus became aware of his claims.

88.     Similarly, Defendants stonewalled Mr. Driscoll's attempts to discover their scheme. Defendants' representative rushed Mr. Driscoll through the signing process, and thereafter ignored Mr. Driscoll's attempts to seek additional information such as his balance statement. Mr. Driscoll only became aware of his claims in the second half of 2017 when he read a story about Defendants on a veterans' interest website.

89.     Based on Defendants' representations, Mr. Underwood, Mr. Driscoll, and other class members had no reason to believe that their transactions with Defendants were loans or an assignment of their military benefits.  Defendants specifically represented that their transactions were "Sales" agreements and reasonable consumers do not have the regulatory training to determine otherwise. Certainly, Defendants' fraud would not have been as successful in ensnaring so many veterans had it been so easily discovered.

90.     Even with the exercise of reasonable diligence Plaintiffs would likely not have discovered the true nature of Defendants' transactions. It was only on March 7, 2017, when the Consumer Financial Protection Bureau ("CFPB") publically announced its investigation, that Defendants' scam became widely known. Until then, few publically available sources have discussed Defendants' scheme. Defendants issued a notice to its investors confirming that ***the primary reason consumers, businesses, and state regulators reevaluated the legality Defendants' transactions was the disclosure of the CFPB's investigation***:

**FIP's Lawsuit to Prevent the Bureau from Publicizing the CID**

On January 9, 2017, sued the Bureau in the U.S. District Court for the District of Columbia. *See John Doe Co. v. CFPB*, No.1:17-cv-00049-RC (D.D.C.).  FIP sought, among other relief, an injunction preventing the Bureau from publicizing its investigation.  In response, the Bureau agreed not to publish that investigation before February 17, 2017, while the district court considered FIP's motion.

The district court denied FIP's motion for preliminary injunction on February 17, 2017—one day after the D.C. Circuit agreed to rehear *PHH* en banc.  *See John Doe Co. v. CFPB*, 235 F. Supp. 3d 194 (D.D.C. 2017).  The district court did, however, issue a 14-day injunction prohibiting the Bureau from announcing its investigation before March 4, 2017.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

FIP then moved in the D.C. Circuit for an emergency injunction pending appeal.  On March 3, 2017, a divided D.C. Circuit denied FIP's request for an injunction.  *See John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017).  Judge Kavanaugh wrote in dissent that he would have issued an injunction pending appeal.

The Bureau then "wasted no time in unmasking the company."  David Lazarus, *'Pension advance' company is unmasked — and it's no friend of California consumers*, L.A. Times (Mar. 14, 2017), http://www.latimes.com/business/lazarus/la-fi-lazarus-cfpb-future-income-payments-20170317-story.html

On March 7, 2017, the Bureau published a "Future Income Payments, LLC," webpage on its website that contains FIP's Petition to Revoke the CID and Director Cordray's Decision denying that Petition *https://www.consumerfinance.gov/policy-compliance/enforcement/petitions/future-income-payments-llc/*.

[…]

**Consequences of the Bureau's Decision to Publicize the Investigation**

The Bureau's announcement that FIP was the target of an ongoing investigation caused substantial damage to FIP's business.  The announcement has caused that harm and posed that threat even though (1) the Bureau insists that it has made no determination of whether FIP's business practices comply with the laws and rules the CFPB enforces, and (2) the Ninth Circuit has stayed enforcement of the CID.

The primary harm to FIP has been damage to its relationships with the people and entities that FIP relies on to conduct its business.  FIP depends on various service providers to hold and transfer money, facilitate the purchase and sale of income streams, and otherwise keep partner with FIP to implement its business model.  ***In the months since the Bureau announced its investigation, many of those providers have severed their ties with FIP because they are aware of the Bureau's reputation and themselves wished to avoid entanglement in an ongoing federal investigation***.

***The Bureau's announcement has also spurred class action lawyers to file lawsuits against FIP***.  In one case, a lawyer filed a purported class action against FIP even though that lawyer's client was not a FIP customer.  *See Block v. Future Income Payments, LLC*, No. 3:17-cv-01808-YY (D. Or. filed Nov. 11, 2017).  When pressed to explain why the lawyer had nonetheless sued FIP, the lawyer cited Director Cordray's Decision and Order as justification for the lawsuit.  ***In another example, class action lawyers repeatedly cited in their complaint the L.A. Times article referenced above in which Mr. Lazarus wrote that the "CFPB wasted no time in unmasking"*** FIP as the target of an ongoing investigation.  *See Underwood v. Future Income Payments, LLC.*

[…]

***During the same period, largely because of the Bureau's insistence upon publicizing FIP's identity, FIP has endured investigations initiated by multiple state agencies and Attorneys General***. FIP  actively participated in approximately 16 discrete state-level investigations and/or active claims in litigation, including litigation in Pennsylvania, Minnesota, Los Angeles, and ***two class action lawsuits (that are clearly tied to the Bureau's publication of FIP's identify)***.  The central issues in the investigations and suits are similar.  ***They go to the nature of the transaction, and whether it is a purchase and sale of an asset or a small loan.  If a purchase and sale, as FIP designs the transactions to be, then they are unregulated by state (or federal) law.  If a loan, then FIP would be required to be licensed in***

- 22 -

*every state, and it is not licensed as it does not consider itself to be in the business of lending*.

(emphasis added). Defendants conceded that it was disclosure of the CFPB's investigation that spurred state regulatory investigation "whether [Future Income Stream Purchase and Sale Agreement] is a purchase and sale of an asset or a small loan."    Additionally, Defendants stated that other businesses only reconsidered their relationships with Defendants after the CFPB's investigation became public.   Thus, it is only reasonable that the same March 7, 2017 disclosure should also be the first reasonable indication to consumers that they may have been defrauded.

## IX.    CLASS ALLEGATIONS

91.    This action is brought as a class action pursuant to Federal Rule of Civil Procedure Rule 23. The proposed class is defined as follows:

> All retired enlisted military personnel or disabled military personnel of any rank who have entered into a transaction with Defendants in which Defendants paid upfront cash in return for the veteran's promise to redirect monthly pension or disability benefits directly to any Defendant.

Excluded from the class are any persons who have previously obtained a judgment or settled any claims against Defendants concerning the types of claims asserted herein or have previously executed releases precluding any such claims against Defendants.

92.    There are genuine questions of law and fact common to the class that predominate over any individual questions. These common questions, which demonstrate a community of interest among class members, include:

a.    Whether the form transactions Defendants have entered into with class members should be classified as loans under applicable law;

b.    Whether Defendants' transactions involve the obtaining of an assignment of the class members' right to receive military pension benefits and, if so, whether such renders the transactions illegal and either void ab initio or voidable at the option of the veteran;

c.    Whether the form documents drafted by Defendants and used by them in their transactions with class members contain provisions which are unconscionable and

- 23 -

unenforceable;

d.      Whether California law should be applied in assessing the legality of Defendants' transactions, regardless of where the veteran resides, as stated in the form contract documents drafted by Defendants;

e.      Whether Defendants' conduct violates the Unfair Competition Law;

f.      Whether Defendants' transactions impose interest rates in excess of the maximum rate permitted under Cal. Const. Art. XV, § 1 and the Usury Law;

g.      Whether Defendants' conduct violates the Consumer Legal Remedies Act;

h.      Whether Defendants failed to disclose certain material credit terms in violation of the Truth in Lending Act;

i.      Whether Defendants' conduct violates the unlawful debt collection provisions of the Racketeer Influenced and Corrupt Organizations Act;

j.      Whether Defendants have been unjustly enriched by the retention of payments by class members in the manner described within;

k.      Whether Defendants should be enjoined from continuing to procure the assignment of military retirement and disability pension benefits;

l.      Whether Defendants should be ordered to provide restitution to the class;

m.      Whether class members are entitled to an award of damages as a result of Defendants' conduct, and if so, in what amount; and

n.      Whether class members are entitled to disgorgement of any funds received by Defendants, and if so, in what amount.

93.      The claims of Plaintiffs are typical of the claims of the class members. Each class member was subjected to the same illegal conduct of Defendants, was harmed in the same way, and has claims for relief under the same legal theories.

94.      Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have common interests with all members of the class and will vigorously protect the interest of the class through qualified counsel experienced in handling class action and consumer protection cases. Neither the named Plaintiffs nor class counsel has any interests which would conflict with the

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

interests of the class members.

95.     A class action is a superior method for the fair and efficient adjudication of this controversy. Most class members are unaware of the availability of legal challenge to the transactions they entered into with Defendants. Moreover, given the common questions to be resolved, class litigation is the superior method of resolving these legal challenges in one proceeding, thus avoiding a multiplicity of parallel suits. A class action will avoid the possibility of inconsistent adjudications of the same legal question.

## FIRST CAUSE OF ACTON
### (Declaratory Relief, 28 U.S.C. §§ 2201 *et seq.* )

96.     Plaintiffs restate all prior allegations as though fully pled herein.

97.     An actual and justiciable controversy exists between the parties as to their respective rights and obligations under the form document entitled "Purchase and Sale Agreement" (the "Agreement"), which each class member has entered into with Defendants. Plaintiffs, on behalf of the class, contend that some or all of the provisions in the Agreement are illegal, void, voidable, unconscionable, and/or unenforceable. Plaintiff is informed and believes that Defendants contend to the contrary.

98.     Plaintiffs seek the following declarations regarding their obligations, and those of class members, under the Agreement:

a.     The transaction evidenced by the Agreement is, under law and equity, a loan, subject to applicable usury limitations on the maximum permissible rate of interest which may be charged and recovered;

b.     Defendants may not enforce or collect any amount from Plaintiff or class members beyond return of the principal of the loan, because the interest rate evidenced in the Agreements with Defendants exceeds the maximum permissible rate set forth in Cal. Const. Art. XV, § 1;

c.     The provisions of the Agreement purporting to require Plaintiff and class members to provide Defendants direct access to military benefits are void and unenforceable

attempts to circumvent the prohibition upon assignments of military benefits set forth in 38 U.S.C. § 5301(a)(3)(C), 37 U.S.C. § 701(c), 15 U.S.C. §§ 1601, et seq., and 16.C.F.R. § 444.2(a)(3);

d.   The provision in the Agreement purporting to cause all remaining and unpaid payments to be immediately due and payable if there is "any disruption, interruption or decrease in those payments . . . caused by the [veteran]" is an unenforceable penalty clause; and

e.   The Agreement is unconscionable and unenforceable, and/or void as a matter of law.

WHEREFORE Plaintiffs pray for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**(Violation of the California Unfair Competition Law,**
**Bus. & Prof. Code §17200 *et seq*. ("UCL"))**

99.   Plaintiffs restate all prior allegations as though fully pled herein.

100.   Defendants' practice of requiring Plaintiffs and class members to assign their right to receive military pension and/or disability benefits is expressly prohibited by federal law as alleged herein. Moreover, Defendants' transactions involve the assessment of interest that exceeds the maximum rate set forth in Cal. Const. Art. XV, § 1, violate the CLRA, and violate California Civil Code, section 1670.5. Therefore, Defendants' practices constitute unlawful competition under the "unlawful prong" of the UCL.

101.   The acts complained of herein, including the disguising of loan transactions as non-loan transactions, the insertion into contracts of numerous unconscionable and unenforceable terms, the presentation of misleading descriptions of the purported benefits of its transactions to veterans, and the charging of imputed interest in excess of the legally permitted rate, constitute unlawful competition under the "unfair" and "fraudulent" prongs of the UCL.

102.   These acts offend established public policies or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Alternatively, these acts cause harm to veterans which outweigh any utility flowing from them.

103.   The acts complained of herein, including the disguising of loan transactions as non-loan transactions, in order to charge a higher interest rate, are also capable of deceiving a reasonable

consumer.

104.    Plaintiffs have suffered an economic injury and have lost money or property as a result of Defendants' acts of unfair competition.

105.    On information and belief, Defendants continue to engage in some or all of these unlawful acts and will continue to do so unless enjoined. As a result of these acts of unfair competition, over the last four years Defendants have obtained money or property from Plaintiffs and class members which they should not, in equity, be permitted to retain, including but not limited to excess interest payments. Plaintiffs and the general public are entitled to injunctive relief, restitution, and other equitable relief.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
### (The Usury Law, Cal. Const. Art. XV, § 1)

106.    Plaintiffs restate all prior allegations as though fully pled herein.

107.    As alleged above, Plaintiffs and class members have paid to Defendants interest in excess of the maximum permissible rate authorized under Cal. Const. Art. XV, § 1. Pursuant to the Usury Law, Stats. 1919, p. xxxiii, Deering's Uncod. Initiative Measures & Stats. 1919-1, Plaintiffs and class members are entitled to repayment from Defendants of treble the amount of all such interest paid within one year past.

108.    The transactions entered into between Defendants, on the one hand, and Plaintiff and class members, on the other, were in substance loans calling for usurious rates of interest. Under the terms of these transactions, usurious interest was absolutely payable by Plaintiffs and class members. On information and belief, Defendants willfully entered into each of the transactions with Plaintiffs and class members, intending to receive the interest payments called for under those transactions.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### (Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"))

109.    Plaintiffs restate all prior allegations as though fully pled herein.

110.    By entering into the subject transactions with Defendants involving the assignment of

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

their military pension and/or disability pay, Plaintiffs and the classPlaintiffs and the class members are consumers as that term is defined in Civil Code § 1761.

111.   Defendants have violated Civil Code §§ 1770(a)(5), (14) and (19), through the acts alleged herein, thereby entitling Plaintiffs and members of the class to relief under Civil Code § 1780 by, inter alia:

    a.   Representing that goods or services have characteristics which they do not have or that a person has a status, affiliation or connection which he or she does not have, in violation of § 1770(a)(5);

    b.   Representing that a transaction confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law, in violation of § 1770(a)(14); and

    c.   Inserting an unconscionable provision in a contract, in violation of § 1770(a)(19).

112.   Defendants' violations of Civil Code § 1770 described above present a continuing threat to class members and members of the public in that Defendants are continuing to engage in these practices, are continuing to refuse to refund amounts paid by consumers, and will not cease until an injunction is issued by the Court.

113.   By letter dated August 3, 2017, mailed as directed in Civil Code § 1782 and received by Defendants on August 8, 2017, Plaintiffs notified Defendants of their violations of the CLRA and demanded that Defendants provide remedies to rectify their conduct.

114.   Defendants have failed to give or agree to give within a reasonable time, a sufficient remedy as set forth in California Civil Code § 1782(c) for the above-mentioned violations of law.

115.   As a direct and proximate result of the aforementioned acts, Plaintiffs and each member of the class he represents have suffered injury in an amount subject to proof at trial and are entitled to recover damages pursuant to California Civil Code § 1780.

116.   Plaintiffs and the members of the class are entitled to an award of attorneys' fees and costs against Defendants pursuant to the provisions of Civil Code § 1780(d).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### FIFTH CAUSE OF ACTION

**(Violation of the Federal Truth in Lending Act,
15 U.S.C. §§ 1601 *et seq.*, ("TILA"))**

117.    Plaintiffs restate all prior allegations as though fully pled herein.

118.    TILA and Regulation Z require that certain material disclosures be provided to a consumer before consummation of a loan contract. 15 U.S.C. § 1638(a)-(b); 12 C.F.R. § 1026.17(a)-(b), 1026.18.

119.    Among the required material disclosures in a closed-end credit transaction are the finance charge and APR. 15 U.S.C. §§ 1602(v), 1638(a)(3)-(4); 12 C.F.R. § 1026.18(d)-(e).

120.    The finance charge is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

121.    Regulation Z requires that a contract for closed-end credit disclose the finance charge, "using that term, with a brief description such as 'the dollar amount the credit will cost you.'" 12 C.F.R. § 1026.18(d).

122.    The APR is "a measure of the cost of credit, expressed as a yearly rate." 12 C.F.R. § 1026.22(a)(1); *see also* 15 U.S.C. § 1606(a).

123.    Regulation Z requires that a contract for closed-end credit disclose the APR, "using that term, with a brief description such as 'the cost of your credit as a yearly rate.'" 12 C.F.R. § 1026.18(e).

124.    The "discount," "management fee," and "account setup and servicing fee" charged by Defendants are all incident to the extension of credit and part of the finance charge required to be disclosed to consumers and included in calculation of the APR disclosed to consumers. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. §§ 1026.18, 1026.22.

125.    In the course of extending closed-end credit, Defendants used credit agreements that did not include the brief descriptions of the finance charge and APR required by Regulation Z. 12 C.F.R. § 1026.18(d)-(e).

126.    In the course of extending closed-end credit, Defendants used credit agreements that failed to disclose the finance charge and APR required by TILA and Regulation Z. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. § 1026.18(d)-(e); 12 C.F.R. § 1026.22.

127.     Defendants therefore violated TILA and Regulation Z. 15 U.S.C. §§ 1605(a), 1606(a), 1638(a)-(b); 12 C.F.R. § 1026.18(d)-(e); 12 C.F.R. § 1026.22.

128.     Plaintiffs and the members of the class are entitled to an award of actual damages, twice the amount of any finance charge, costs and reasonable attorney's fees pursuant to the provisions of 15 U.S.C. § 1640.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**(Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO"))**
**(Against Defendant Kohn)**

129.     Plaintiffs restate all prior allegations as though fully pled herein.

130.     This count is against Mr. Kohn for violation of RICO, 18 U.S.C. § 1962(c), for using Future Income Payments, LLC; Pensions, Annuities and Settlements, LLC; and Cash Flow Investment Partners, LLC, (the "Enterprise Defendants") to collect unlawful debt.

131.     RICO Section 1962(c) provides that: "It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity *or collection of unlawful debt*."[14] (emphasis added). *See United States v. Auco*in, 964 F.2d 1492, 1496-97 (5th Cir. 1992) ("It is clear to us that Congress intentionally created a statutory scheme where proof of the collection of unlawful debt is a *substitute* for a showing that appellants engaged in two or more predicate acts forming a pattern of racketeering activity.") (emphasis in original) (internal quotations and citation omitted); *see also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 652 F. Supp. 101, 103 (E.D.N.Y. 1986) (To state a claim for collection of an unlawful debt under RICO, plaintiff must show that the loan carries twice the enforceable interest rate and is incurred in connection with the business of lending money at a usurious rate).[15]

---

[14] Unlawful debt" generally means a debt that is incurred or contracted in a gambling activity or business in violation of federal, state or local law or is unenforceable, in whole or in part, due to usury laws. 18 U.S.C. § 1961(6).

[15] Under California law, interest will be twice the enforceable rate if it exceeds 20 percent per year. Cal. Const., Art. XV § 1.

132.   Mr. Kohn is a person within the meaning of Section 1962(c).

133.   The Enterprise Defendants are enterprises within the meaning of Section 1962(c). *See Cedric Kushner Promotions, LTD., v. Don King*, 533 U.S. 158 (2001) (while the enterprise required by the statute must be more than the person operating under another name, the requisite distinctness between respondent and his corporation was established since they were legally different entities).

134.   Mr. Kohn is employed by or associated with the Enterprise Defendants. Specifically, Mr. Kohn owns 100% of the Enterprise Defendants and has complete authority, power, and discretion to make any and all decisions regarding the Enterprise Defendants.

135.   The Enterprise Defendants are engaged in interstate commerce, and their activities affect interstate commerce. Specifically, the Enterprise Defendants advertised to, solicited, and made and collected pension loans to and from pensioners across the nation.

136.   The Enterprise Defendants also use instrumentalities of interstate commerce in their daily activities, including automobiles, telephones, the internet, and the mails.

137.   Mr. Kohn conducts or participates in the affairs of the Enterprise Defendants through the collection of unlawful debt in violation of 18 U.S.C. § 1962(c). Specifically, Mr. Kohn directed the Enterprise Defendants to make and collect pension loans to and from pensioners at a rate of interest in excess of the legal rate in California.

138.   The pension loans (and the interest rates charged therein) constitute unlawful debt within the meaning of Section 1962(c) as the term is defined in Section 1961(6). Specifically,

   a.   A substantial portion of the interest rate is unenforceable under state usury law. Under California law, a lender is prohibited from charging a rate greater than 10% per annum as compensation for the use of money. Cal. Const. Art. XV, §1.

   b.   The Enterprise Defendants make pension advances as part of their business. The Enterprise Defendants' practice of making usurious pension advances to veterans and other pensioners constitutes the principal portion of their business and is memorialized in their training manuals. Defendants use the pension advances as a scheme to steal income from debt-burdened veterans by charging interest rates higher than is lawfully allowed.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

c. The pension advances are issued at a rate far in excess of twice the enforceable rate allowed in California. 18 U.S.C. § 1961(6).

119. The pension advances occur across state lines in interstate commerce as many class members, including Plaintiffs, reside in different states than Defendants.

120. Defendants attempt to collect on the pension advances by directly debiting accounts and pursuing other debt collection practices.

139. As a direct and proximate result of the aforementioned acts, Plaintiffs and each member of the class he represents have suffered injury in an amount subject to proof at trial and are entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorneys' fees, against Defendants pursuant to the provisions of 18 U.S.C. § 1964(c). *Allstate Ins. Co. v. Polack*, No. CV 08-0565 (ADS) (ETB), 2012 U.S. Dist. LEXIS 141927, at *23 (E.D.N.Y. Sep. 12, 2012) ("an award of treble damages is <u>mandatory</u>") (emphasis added) (*citing Cullen v. Margiotta*, 811 F.2d 698, 713 (2d Cir. 1987)) (noting that "civil RICO requires that a successful plaintiff be awarded treble damages").

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

140. Plaintiffs restate all prior allegations as though fully pled herein.

141. Defendants, by the actions alleged above, have collected money from Plaintiffs and class members under such circumstances that in equity and good conscience Defendants cannot retain, and which in justice and fairness belongs to Plaintiffs and the class.

142. Within the last four years, Defendants have become indebted to Plaintiffs and class members in the amount of all excess interest paid within that period. No part of these sums have been repaid to Plaintiffs or class members.

143. As a result of Defendants' violations, described above, Defendants have unjustly enriched themselves at the expense of the class. Defendants' unjust enrichment continues to accrue as they continue to engage in their unlawful business practices and collect loan payments and excess interest, as described above.

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

144.    Defendants' retention of money gained through their unlawful and deceptive practices is unjust considering the circumstances under which the funds were obtained.

145.    As a result of the foregoing, Plaintiffs and the members of the class have been deprived of their money and suffered loss as alleged above.

146.    To prevent unjust enrichment, Defendants should be required to identify, account for, fully refund, and provide restitution of their ill-gotten gains including interest collected in excess of the legal maximum, and fruits of those gains, to Plaintiffs and the class. Defendants should be ordered to refund all sums paid to them, together with interest thereon, and to pay reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, requests and prays that this Court enter a judgment against Defendants as follows:

(a)    Certifying this case as a Class Action with Plaintiffs as class representative and Plaintiffs' counsel as class counsel;

(b)    Declaring the respective rights and obligations of the parties under the "Purchase and Sale Agreements";

(c)    Declaring the assignment by Plaintiffs and those similarly situated of their military pensions void or voidable;

(d)    Ordering Defendants to restore to Plaintiffs and class members all amounts collected by Defendants which may have been acquired by means of any practices found by this Court to be illegal, unfair, or deceptive or otherwise prohibited by law;

(e)    Permanently enjoining Defendants from taking any assignment of the disability payments of any veteran and the pension benefits of any enlisted veteran;

(f)    Awarding treble damages in amounts to be proven at trial;

(g)    Awarding treble the amount of all excess interest paid to Defendants within the past year prior to the filing of this Complaint;

(h)    Awarding pre-judgment interest on all other amounts awarded;

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

1     (i)      Awarding costs and attorneys' fees as authorized by law; and

2     (j)      Granting such other and further relief as may be deemed just and proper in the

3 premises.

4                    **XI.**    **JURY DEMAND**

5     Plaintiffs, JOHN UNDERWOOD and JOHN DRISCOLL, individually and on behalf of all

6 others similarly situated, by and through their attorneys, hereby demands a trial by jury pursuant to

7 Rule 38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided

8 with respect to the above-entitled cause.

9

10 DATED: May 16, 2018                    Respectfully submitted,

11                                    FINKELSTEIN & KRINSK LLP

12                                    By: /s/ Trenton R. Kashima

13                                    Jeffrey R. Krinsk, Esq.

14                                    Trenton R. Kashima, Esq.
David J. Harris, Esq.

15                                    550 West C St., Suite 1760
San Diego, CA 92101

16                                    Telephone:  (619) 238-1333
Facsimile:   (619) 238-5425

17                                    Lance C. Young (will pro hac vice)

18                                    Amy L. Marino (will pro hac vice)
Rod M. Johnston (will pro hac vice)

19                                    SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor

20                                    Southfield, MI 48076
Phone: (248) 355-0300

21                                    lyoung@sommerspc.com
amarino@sommerspc.com

22                                    rjohnston@sommerspc.com

23                                    Jason T. Brown (will pro hac vice)

24                                    Nicholas Conlon (will pro hac vice)
Alexander B. Imel (will pro hac vice)

25                                    JTB LAW GROUP, L.L.C.
155 2nd Street, Suite 4

26                                    Jersey City, NJ 07302
Phone: (201) 630-0000

27                                    Fax: (855) 582-5297
jtb@jtblawgroup.com

28                                    nicholasconlon@jtblawgroup.com
alec.imel@jtblawgroup.com

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT

1

*Attorneys for Plaintiffs*
*and the putative class*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED PLAINTIFFS' CLASS ACTION COMPLAINT