**JTB LAW GROUP, LLC**
Jason T. Brown (admitted pro hac vice)
Nicholas Conlon (admitted pro hac vice)
155 2ND Street Suite 4
Telephone: (201) 630-0000
Facsimile: (855) 582-5297
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com

Attorneys for Plaintiffs
and the Putative Classes

Additional Counsel Listed On Signature Page

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN UNDERWOOD**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**FUTURE INCOME PAYMENTS, LLC**; **PENSIONS, ANNUITIES AND SETTLEMENTS, LLC**; **CASH FLOW INVESTMENT PARTNERS, LLC** (dismissed), and **SCOTT A. KOHN**,<br><br>Defendants. | Case No: 8:17-cv-01570-DOC-DFM<br><br>**NOTICE OF MOTION AND MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT**<br><br>Date: September 10, 2018<br>Time: 8:30 AM<br>Courtroom: 9D |

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 10, 2018 at 8:30 AM, or as soon thereafter as the matter may be heard, in Courtroom 9D of the United States District Court for the District of California, located at 411 West Fourth Street, Santa Ana, CA, 92701, 9th Floor, Plaintiffs will and hereby move the Court for an order granting the entry of a default and default judgment seeking the following remedies:

**<u>INJUNCTIVE RELIEF</u>**

Plaintiffs request that the Court issue a permanent injunction against Defendants and their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, that includes the following material terms:

(1)   A prohibition against soliciting or creating any further cash advances or loans, especially if secured or connected to veterans' unassignable pension benefits; and

(2)   A prohibition against collecting or transferring any amounts from veterans beyond the amount of the initial advance from FIP.

The proposed injunctive relief is necessary and appropriate because the claims otherwise warrant an injunction, and Defendants have chosen to abandon this lawsuit. Furthermore, due to Defendants' actions, the illegal payments may continue without an injunction.  Failure to grant the injunction would needlessly expose Plaintiffs to the risk of continuing irreparable harm.

**<u>DAMAGES</u>**

Plaintiffs request damages in the amount of $1,037,328.88, which includes actual damages, treble damages, and civil penalties.

**<u>COSTS AND ATTORNEYS' FEES</u>**

Plaintiffs request $6,289.22 in costs and $341,827.74 in attorneys' fees.

This Motion is made following the Parties' Stipulation of Default Judgment against Defendants on May 31, 2018 (Dkt. 67).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: August 3, 2018

Respectfully submitted,

JTB LAW GROUP, LLC

By: /s/ *Jason T. Brown*
Jason T. Brown

Jason T. Brown (admitted pro hac vice)
Nichlas Conlon (admitted pro hac vice)
155 2nd Street Suite 4
Telephone: (201) 630-0000
Facsimile:  (855) 582-5297
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com

Jeffrey R. Krinsk, Esq.
Trenton R. Kashima, Esq.
FINKELSTEIN & KRINSK LLP
550 West C St., Suite 1760
San Diego, CA 92101-3593
Telephone:  (619) 238-1333
Facsimile:   (619) 238-5425

Lance C. Young (will pro hac vice)
Amy L. Marino (will pro hac vice)
Rod M. Johnston (will pro hac vice)
SOMMERS SCHWARTZ P.C.
One Towne Square, 17th Floor
Southfield, MI 48076
Telephone: (248) 355-0300
lyoung@sommerspc.com
amarino@sommerspc.com
rjohnston@sommerspc.com

- 3 -

PLAINTIFFS' NOTICE OF MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

**JTB LAW GROUP, LLC**
Jason T. Brown (admitted pro hac vice)
Nichlas Conlon (admitted pro hac vice)
155 2ND Street Suite 4
Telephone: (201) 630-0000
Facsimile:  (855) 582-5297
jtb@jtblawgroup.com
nicholasconlon@jtblawgroup.com

Attorneys for Plaintiffs
and the Putative Classes

Additional Counsel Listed On Signature Page

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN UNDERWOOD**, individually and on behalf of all others similarly situated, | Case No: 8:17-cv-01570-DOC-DFM |
| Plaintiff, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT** |
| v. | |
| **FUTURE INCOME PAYMENTS, LLC**; **PENSIONS, ANNUITIES AND SETTLEMENTS, LLC**; **CASH FLOW INVESTMENT PARTNERS, LLC** (dismissed), and **SCOTT A. KOHN,** | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................... 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ........................................ 2

     A.   Factual Allegations............................................................................ 2

     B.   Procedural History ............................................................................ 6

III. LEGAL STANDARD .................................................................................. 8

IV.  ANALYSIS ............................................................................................... 10

     A.   Plaintiffs Have Complied with   FED. R. CIV. P. 55(A), 54(C), AND
          Local Rules 55–1 and 55–2 ............................................................. 10

     B.   The *Eitel* Factors  Support  Granting  Default  Judgment  Against
          Defendants....................................................................................... 10

          1.   Possibility of Prejudice to Plaintiff................................... 10

          2.   Substantive Merits and Sufficiency of the Complaint.................. 11

          3.   Amount at Stake................................................................. 17

          4.   Possibility of Dispute......................................................... 18

          5.   Possibility of Excusable Neglect ....................................... 18

          6.   Policy Implications Favoring Decisions on the Merits .............. 19

     C.   Remedies .......................................................................................... 19

          1.   Damages............................................................................. 19

          2.   Injunctive Relief is Appropriate ........................................ 20

          3.   Costs and Attorneys' Fees ................................................. 21

V.   CONCLUSION ........................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aldabe v. Aldabe,* 616 F.2d 1089 (9th Cir. 1980) ........................................................ 8

*Brockey v. Moore*, 107 Cal.App.4th 86 (2003) ............................................................. 12

*Broughton v. Cigna Healthplans*, 21 Cal.4th 1066 (1999).......................................... 21

*Cedric Kushner Promotions, LTD., v. Don King*, 533 U.S. 158 (2001) ...................... 16

*Chapman v. Skype Inc*., 220 Cal.App.4th 217 (2013) .................................................. 12

*Consumer Fin. Prot. Bureau v. Future Income Payments, LLC*, 252 F.Supp.3d 961
    (C.D. Cal. 2017) ....................................................................................................... 14

*Cripps v. Life Ins. Co. of N. America,* 980 F.2d 1261 (9th Cir. 1992) ....................... 10

*Delno v. Mkt. St. Ry. Co*., 124 F.2d 965 (9th Cir. 1942) ............................................. 17

*Discovery Communications, Inc. v. Animal Planet, Inc.,* 172 F.Supp.2d 1282
    (C.D.Cal. 2001) .......................................................................................................... 9

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 652 F. Supp. 101 (E.D.N.Y. 1986)
    ................................................................................................................................ 16

*Eitel v. McCool,* 782 F.2d 1470 (9th Cir.1986) ....................................................... 9, 18

*Graciano v. Robinson Ford Sales, Inc.*, 50 Cal.Rptr.3d 273 (2006) ........................... 22

*Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.,* 973 F.2d 155 (2d Cir. 1992).. 9

*In re Visioneering Construction*, 661 F.2d 119 (9th Cir. 1981) ................................... 13

*Ketchum v. Moses*, 24 Cal.4th 1122 (2001)................................................................. 22

*Kloepping v. Fireman's Fund,* No. C 94–2684 TEH, 1996 WL 75314 (N.D.Cal. 1996)
    ................................................................................................................................. 8

*Lavie v. Procter & Gamble Co*., 105 Cal.App.4th 496 (2003)..................................... 20

*Lee On v. Long*, 37 Cal. 2d 499 (1951) ........................................................................ 15

*McGill v. Citibank, N.A*., 2 Cal.5th 945 (2017) ........................................................... 21

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950) ....................... 19

*PepsiCo Inc. v. Cal. Sec. Cans,* 238 F.Supp.2d 1172 (C.D.Cal. 2002)........ 9, 11, 18, 19

*PepsiCo v. Triunfo–Mex, Inc.,* 189 F.R.D. 431 (C.D.Cal. 1999) ................................. 9

*Serrano v. Priest*, 20 Cal. 3d 25 (1977)....................................................................... 22

*State Farm Fire & Cas. Co. v. Sup. Ct*., 45 Cal.App.4th 1093 (1996) ........................ 15

*TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915 (9th Cir. 1987).............................9, 18

*Thompson v. 10,000 RV Sales, Inc.,* 130 Cal.App.4th 950 (2005) ...............................20

*Thomson v. Wooster,* 114 U.S. 104 (1884)..............................................................13

*Williams v. Gerber Prod. Co.,* 552 F.3d 934 (9th Cir. 2008)........................................12

*Wu v. Ip,* No. C93–4467 FMS, 1996 WL 428342 (N.D.Cal. 1996)...............................9

**Other Authorities**

Schwarzer, *et al., California Practice Guide: Federal Civil Procedure Before Trial* § 6:131 (2003) ......................................................................................................10

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
ENTRY OF DEFAULT AND DEFAULT JUDGMENT

## I.   **INTRODUCTION**

On September 12, 2017, Plaintiffs filed this putative class action against Defendants Future Income Payments, LLC ("FIP"); Pensions, Annuities and Settlements, LLC; and Scott A. Kohn ("Defendants"), seeking to enjoin Defendants' practice of making and collecting loans issued at unlawfully high interest rates to veterans secured by these veteran's unassignable pension benefits.

By the time of Plaintiffs' suit, FIP and its owner, Scott Kohn, were in the midst of a Consumer Financial Protection Bureau (CFPB) investigation, and they had already been kicked out of California and charged with predatory lending by the California Commissioner of Business Oversight for making "loans" without a license. These Defendants also entered into a consent judgment with the New York State Department of Financial Services in October 2016, which required FIP to pay a $500,000 civil penalty, cease all consumer-related transactions within the State of New York; and forgive all amounts due in excess of the amounts advanced.  That forgiveness amounted to $6,348,232 for the 292 transactions Defendants initiated in New York.

Defendants were each properly served with summonses and copies of Plaintiffs' Complaint.  ECF# 17-20.  Attorneys from Womble Bond Dickinson, LLP and DLA Piper, LLP subsequently filed appearances for all Defendants, and Defendant's moved to dismiss Plaintiffs' Complaint on various grounds.  Dkt. 30.  On April 26, 2018, the Court denied Defendants' motion to dismiss in substantial part (Dkt. 60), and Plaintiffs thereafter immediately served their first set of written discovery.

Then, in April 2018, Plaintiffs' counsel learned that FIP had notified its selling agents that "FIP [had] lost its fight for survival." Declaration of Nicholas Conlon ("Conlon Decl."), concurrently filed herewith, ¶ 2, Ex. A.  FIP also apparently notified its investors, that FIP would no longer be servicing the loans it had made and investors would have to take steps to individually collect from the borrowers.  *Id.*, ¶ 3, Ex. B (April 29, 2018 letter from FIP investor Alan Macnab to borrower Thomas

Gray) ("Mr. Kohn has left it to me to try to re-establish the payment relationship [with you]").  FIP also suggested to investors that it will "restructure its operations" and reduce overhead. *Id.*, ¶ 4, Ex. C (April 10, 2018 letter from FIP to buyers and advisors). Upon learning of these developments, after first claiming ignorance of them, defense counsel moved to withdraw from the case stipulating that Defendants no longer intended to defend the case or participate in discovery.  *Id.*, ¶¶ 5-6.

Plaintiffs now move pursuant to Fed.R.Civ.P. 55(b) for entry of a default judgment including injunctive relief, damages, costs, and attorneys' fees.  A proposed final judgment is submitted herewith.  In the event the Court declines to enter injunctive relief, Plaintiffs request the opportunity to amend their complaint to add a few dozen other borrowers to the case and to seek class certification.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Allegations

The following facts are taken from the Complaint ("Compl.") (Dkt. 1) and from the Court's description of the case in its opinion substantially denying Defendants' motion to dismiss (Dkt. 60):

Defendant FIP is a Delaware limited liability company with its principal places of business in California. Compl. ¶¶ 11, 15. FIP formerly did business as Pensions, Annuities, and Settlements, LLC ("PAS"). *Id.* ¶ 16. FIP also maintains several marketing affiliates, such as Cash Flow Investment Partners, LLC and BuySellAnnuity, LLC. *Id.* ¶ 20.

FIP's business solicits pensioners to enter into loan agreements through its marketing affiliates' websites. *Id.* ¶ 21. In exchange for some or all of their monthly pension for a term (generally five to ten years), FIP provides pensioners a lump sum payment. *Id.* FIP also contracts with investors who provide money for the lump sum cash payments in exchange for some or all of the pensioners' monthly pension payments. *Id.*

Scott A. Kohn is the sole owner of FIP. *Id.* ¶ 23. He is FIP's President,

Secretary, Treasurer, sole member, and has complete authority over its decision making process. *Id.* Kohn is also the sole owner of FIP's affiliated marketing entities, like Cash Flow Investment Partners and BuySellAnnuity. *Id.*

In May 2003, the National Consumer Law Center ("NCLC") reported that companies and individuals were allegedly scamming military personnel by offering upfront cash payments in return for several years of the veterans' benefits. *Id.* ¶¶ 25–26. These companies profited by charging an interest rate between 27% and 106% on loans averaging $40,000-$55,000, depriving veterans of money needed to establish long-term financial security. *Id.* ¶¶ 26, 28. These companies allegedly preyed on vulnerable veterans. *Id.* ¶ 27.

FIP is allegedly one such company. *See generally id.* FIP solicited pensioners across the nation, including in California. *Id.* ¶ 30. FIP steered internet searches to its website. *Id.* ¶¶ 32–33. It advertised its product as a lump-sum pension buyout, or pension advance, allowing pensioners to obtain cash quickly to meet their immediate needs and long-term goals. *Id.* ¶ 31. FIP told its employees to avoid the term "loan." *Id.* ¶ 34. FIP's training manual notes that its products are not loans. *Id.* ¶ 35.

Pensioners would contact FIP through its website to obtain a quote and begin the application process. *Id.* ¶ 38. FIP representatives would contact the pensioner to collect information and documents to allow FIP to complete the underwriting process. *Id.* If FIP verified the pensioners' information, it proposed to give pensioners a lump-sum payment in exchange for a specific amount of the pensioners' monthly pension payments. *Id.* ¶ 40. To complete the loan process, pensioners would complete and sign several documents, which FIP referred to as the "Seller Packet." *Id.* ¶ 41. Although the Seller Packet had several variations, it consisted of approximately nine documents: (1) a contract entitled "Future Income Stream Purchase and Sale Agreement," "Buyer and Pensioner Purchase Agreement for Purchase of Future Income Stream," or "Future Income Payment Purchase and Sale Agreement" (the "Agreement"); (2) Transaction Details; (3) Authorization for Automatic Payments; (4) Disclosures and

Acknowledgments; (5) Certificate of Marital Status; (6) Security Guaranty and Indemnification Agreement; (7) Purchase Agreement; (8) Employment Verification Form; and (9) W9-Request for Taxpayer Identification Number and Certification. *Id.* ¶¶ 41–42. Some pensioners were required to submit additional documents, such as proof of life insurance amount, a voided check, photo identification, or a telephone bill. *Id.* ¶ 43. Once FIP received all these documents, pensioners executed a loan Agreement with the company. *Id.* ¶ 44.

The Agreements also allowed FIP to sell the pensioners' monthly payments to a third party. *Id.* ¶ 46. These third parties were investors who provided the lump sum funds that were paid to pensioners. *Id.* ¶ 47. Until 2015, FIP required pensioners to personally guarantee repayment of the lump-sum loan amounts. *Id.* ¶ 48. After receiving the lump sum from FIP, pensioners would instruct the financial institution where their pension payments were deposited to transfer part of their pensions into a FIP-controlled account. *Id.* ¶ 49. To facilitate the collection of the obligated payments, FIP required pensioners to execute an authorization granting FIP power to collect the pension payments from the pensioners' accounts. *Id.* FIP would deduct $300 from the lump sum amount as an account set-up and servicing fee. *Id.* ¶ 51. Until September 2014, it also charged a monthly $10 "Management Fee." *Id.*

Although FIP's Agreements with pensioners referred to their product as a "sale," it was allegedly really a loan. *Id.* ¶ 53. The Agreements required pensioners to repay the money in installments over a set period and acknowledged that the lump sum was "significantly less" than the amount the pensioner would pay. *Id.* ¶ 53(a)–(b). And before extending the loan, FIP reviewed the borrower's credit risk and engaged in standard loan underwriting assessment. *Id.* ¶ 53(c). For instance, borrowers had to supply FIP with income tax returns, pay checks or stubs, and evidence of other financial status. *Id.* Moreover, the Agreements required the pensioner to pay FIP legal fees and costs if FIP pursued a claim against the pensioner. *Id.* ¶ 53(g). The pensioners were also subject to late fees. *Id.* ¶ 53(h). Some of FIP's Agreements even threatened

pensioners with "criminal fines or imprisonment" if the pensioner intentionally deprived FIP of "the economic benefits contemplated by [the] agreement." *Id.* ¶ 54.

On March 3, 2015, the California Commissioner of Business Oversight issued a cease-and-desist order to FIP, charging that FIP was violating state law by issuing loans without a license. *Id.* ¶ 57. In February 2017, Los Angeles City Attorney Mike Feuer sued FIP, alleging that it was charging interest rates "as high as 96%, far above California's 10% usury limit, and threatened borrowers, falsely, that defaulting on the loans could subject them to criminal liability." *Id.* ¶ 58. City Attorney Feuer described FIP's behavior as "predatory lending" that could "exploit the very financial struggles of California's most vulnerable residents, including seniors and veterans." *Id.* According to City Attorney Feuer's lawsuit, FIP harasses pensioners with 5:30 a.m. debt collection calls. *Id.* ¶ 59. City Attorney Feuer also alleged that FIP falsely assures investors that it complies with all applicable laws. *Id.*

FIP faced similar charges in New York. In 2016, the New York State Department of Financial Services began investigating whether FIP violated New York Banking and Financial Services Law by lending without a license. *Id.* ¶ 61. Later that year, FIP and the Department of Financial Services entered into a consent order in which FIP agreed to pay a $500,000 civil penalty to the Department, stop all consumer-related transactions within New York and with its residents, and stop participating in any money-transmitting activity in the state except to the extent required by the consent order. *Id.* ¶ 62.

Plaintiff John Underwood is a retired and disabled veteran of the United States Air Force. *Id.* ¶¶ 2, 14. After serving for 23 years, Underwood retired from the Air Force with the rank Master Sergeant in 2010. *Id.* ¶ 14. Underwood resides in Otway, Ohio and receives a retirement income of $2,053 per month. *Id.* Shortly after his retirement from the Air Force, Underwood saw a FIP online advertisement describing cash advances for military personnel. *Id.* ¶ 67. Around December 2012, Underwood contacted PAS about obtaining upfront cash payment in exchange for "his payment of

a substantially larger amount over time." *Id.* ¶ 68. After eliciting information about Underwood's military retirement benefits, checking his credit, and obtaining other related information, Defendants informed Underwood that FIP would provide him $10,000 in cash, less fees, if he promised to pay FIP $397 per month over 60 months ("Agreement"). *Id.* Shortly after Underwood agreed, he received $9,700 as net loan proceeds. *Id.* ¶ 71. To date, Underwood has already paid $20,644 for a $9,700 loan. *Id.* As things stand, Underwood is on pace to repay approximately $23,820. *Id.* ¶ 72. FIP allegedly did not disclose material information to Underwood, such as how federal law prohibits the assignment of a military pension or disability benefits. *Id.* ¶ 73.

### B.   Procedural History

This is not a customary default, in which a party simply does not respond to summons.  Defendants appeared before the Court and defended themselves in the instant action.  On November 9, 2017, Defendants moved to strike Plaintiff's class action allegations and dismiss his complaint.  Dkt. 30.[1]  The Court ultimately denied Defendants' Motion as to the legal sufficiency of Plaintiffs' complaint, but granted Defendants' Motion to the extent that the Complaint sought damages arising outside the applicable statute of limitations periods.  *Id.*  The Court, however, granted Plaintiff leave to amend his Complaint to allege that the discovery rule and equitable considerations toll the statute of limitations:

> Here, Plaintiff is a disabled veteran who saw an internet advertisement for military personnel to obtain cash advances. See Compl. ¶¶ 2, 67–68. He likely was unaware of the implications of entering into the Agreement with FIP, and he alleges that FIP failed to inform him that "assignment of his military pension and/or disability benefits is expressly prohibited by federal law," and as a result he was charged a higher interest rate than would otherwise be allowable under California law and had his military pension and/or disability benefits unlawful assigned Id. ¶ 73. Thus, the act causing the injury would have been difficult for Plaintiff as an individual disabled veteran to detect, and Defendants as sophisticated

---

[1] Defendants also engaged in other pre-trial activities, such as meeting for a Rule 26(f) Conference and filing an extensive Joint Rule 26(f) Report and Case Management Statement.  *See* Dkt. 47-48.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR
ENTRY OF DEFAULT AND DEFAULT JUDGMENT

financial actors were in a far better position to comprehend the alleged injury. [Citation]. Thus, the discovery rule may apply.

* * *

Here, Plaintiff alleges that Defendants have targeted vulnerable veterans and their pensions. Compl. ¶ 27. Plaintiff explains that "[v]eterans may have, or perceive themselves to have, unusually heavy debt burdens or poor credit as a result of the financial strains of deployments, frequent relocations, and other challenges of military service." Id. Plaintiff alleges that Defendants knowingly exploit vulnerable veterans. Id. ¶ 3. Specifically, Plaintiff alleges that Defendants concealed the fact that their product was a loan and failed to disclose that assigning a military pension is prohibited by federal law. Id. ¶ 73. Therefore, assuming the allegations are true, it would be difficult for Plaintiff and other veterans to know about the alleged scams at the time that they occurred. [Citation]. It would be unfair and unequitable to expect vulnerable veterans to immediately know when they are being defrauded.

Order Granting in Part Defendants Motion to Strike and Dismiss [Dkt. 60], at pp. 13-15.

On May 26, 2016, Plaintiffs amended the Complaint to allege that they (and other Class members) could not have reasonably known the true nature of Defendants' transaction until March 7, 2017, the date that the Consumer Financial Protection Bureau ("CFPB") publically announced its investigation into Defendants. *See* First Amended Complaint ("FAC") at pp. 19-23.[2] Plaintiffs' allegations were supported by Defendants' own communications with their investors, which confirmed that it was only after the CFPB publically uncovered Defendants' scheme that other regulatory agencies began investigations into "whether [the Future Income Stream Purchase and Sale Agreement] is a purchase and sale of an asset or a small loan" and that business partners began to re-evaluate their relationships with Defendants. *Id.* p. 23. Consequently, it is only reasonable that the same March 7, 2017 disclosure should also be the first practical indication to consumers that they may have been defrauded. *Id.* p. 23.

After the Court cleared the parties to move forward on their merits, and

---

[2] Plaintiffs also amended the Complaint to add John Driscoll as a named Plaintiff. Plaintiffs' counsel also represents 40 total putative class members. Plaintiffs move for Default Judgment on behalf of these identifiable members of the proposed Class.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

Plaintiffs had filed their Amended Complaint and served initial discovery, Defendants threw in the towel. On May 31, 2018, Defendants represented to the Court that they "do not intend to defend themselves further in this matter" and "stipulate to the entry of default judgment against them on the claims asserted by John Underwood and John Driscoll." Joint Stipulation Regarding Withdrawal of Counsel and Default Judgment [Dkt. 67].

## III.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 55(b) provides for a court ordered default judgment following entry of default by the court clerk under Rule 55(a). *See Kloepping v. Fireman's Fund,* No. C 94–2684 TEH, 1996 WL 75314, at *2 (N.D.Cal. 1996). The FRCP and the local rules in the Central District of California require that applications for default judgment set forth the following information: (1) when and against which party default was entered; (2) the identification of the pleadings to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is adequately represented; (4) that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) that notice of the application has been served on the defaulting party, if required. Fed.R.Civ.P. 55(b)(2); C.D. Cal. L.R. 55–1.[3]

Entry of default judgment is governed by Fed.R.Civ.P. 55 and is left to the trial court's sound discretion. *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir. 1980). Because granting or denying relief is entirely within the Court's discretion, a defendant's default does not automatically entitle a plaintiff to a court ordered judgment. *Id.* The Ninth Circuit holds that a district court may consider the following factors in exercising its discretion to award a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)

---

[3] Fed.R.Civ.P. 55(b)(2) and Local Rule 55–1 provide that notice is required to be given to a party against whom judgment by default is sought, if that party has appeared in the action.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT

the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool,* 782 F.2d 1470, 1471–72 (9th Cir.1986).   "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo v. Triunfo–Mex, Inc.,* 189 F.R.D. 431, 432 (C.D.Cal. 1999).

A party seeking a default judgment must state a claim upon which it may recover. *PepsiCo Inc. v. Cal. Sec. Cans,* 238 F.Supp.2d 1172 (C.D.Cal. 2002). After a default has been entered by the court clerk, the well-pleaded factual allegations of the complaint are taken as true, except for those allegations relating to damages. *TeleVideo Sys., Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir. 1987); *Discovery Communications, Inc. v. Animal Planet, Inc.,* 172 F.Supp.2d 1282, 1288 (C.D.Cal. 2001). Plaintiff is required to prove all damages sought in the complaint. In addition, "[a] judgment by default shall not be different in kind [or] exceed in amount that prayed for in the [complaint]." Fed.R.Civ.P. 54(c). In determining damages, a court can rely on the declarations submitted by the plaintiff or order a full evidentiary hearing. Fed.R.Civ.P. 55(b)(2).

Plaintiff's burden in "proving up" damages is relatively lenient. If proximate cause is properly alleged in the complaint, it is admitted upon default. *Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.,* 973 F.2d 155, 159 (2d Cir. 1992). Injury is established and plaintiff need prove only that the compensation sought relates to the damages that naturally flow from the injuries pled. *Wu v. Ip,* No. C93–4467 FMS, 1996 WL 428342 at *1 (N.D.Cal. 1996) (citing *Greyhound Exhibitgroup, Inc.,* 973 F.2d at 159). However, if the facts necessary to determine damages are not contained in the complaint, or are legally insufficient, they will not be established by default. *See Cripps v. Life Ins. Co. of N. America,* 980 F.2d 1261, 1267 (9th Cir. 1992).

Finally, fundamental fairness, required by the due process of law, limits the scope of relief. Schwarzer, *et al., California Practice Guide: Federal Civil Procedure Before Trial* § 6:131 (2003). Under Fed.R.Civ.P. 54(c) and 55(d), a judgment by

- 9 -

default shall not award damages that are different or exceed the amount requested in plaintiff's complaint. Similarly, under Fed.R.Civ.P. 8(a)(3), the demand for relief must be specific. Therefore, a default judgment must be supported by specific allegations as to the exact amount of damages asked for in the complaint.

## IV.   <u>ANALYSIS</u>

### A.   Plaintiffs Have Complied with FED. R. CIV. P. 55(A), 54(C), AND Local Rules 55–1 and 55–2

Plaintiffs have satisfied the procedural requirements for default judgment pursuant to Fed.R.Civ.P. 55(a), Local Rules 55–1 and 55–2, and Fed.R.Civ.P. 54(c). In the pending action, Plaintiffs (1) served Defendants with the summons and complaint on the dates listed in the respective proofs of service (Dkts. 17-20), Conlon Decl. ¶ 7; (2) stipulated with Defendants to enter the default against Defendants for inability to continue their defense, *id.* ¶ 6; (3) stated that Defendant Kohn is not a minor or incompetent lacking adequate representation, *id.* ¶ 8; (4) stated that Defendant Kohn is not in the military or otherwise exempt under the Soldiers' and Sailors' Civil Relief Act of 1940, *id.* ¶ 9; (5) notified Defendants of the amount of damages Plaintiffs request in the entry of default judgment, pursuant to Local Rule 55–2, *id.* ¶ 10, Ex. D; and (6) within this Memorandum, submitted calculations regarding the amount of attorneys' fees incurred pursuant to Local Rule 55–3. Finally, because Plaintiffs do not request relief that differs from or exceeds that prayed for in the Complaint, the application for default judgment complies with Fed.R.Civ.P. 54(c). Accordingly, the Court need only analyze the *Eitel* factors to determine whether default judgment is appropriate.

### B.   The Eitel Factors Support Granting Default Judgment Against Defendants

#### 1.   <u>Possibility of Prejudice to Plaintiff</u>

With respect to the first *Eitel* factor, Plaintiffs would suffer prejudice if the default judgment is not entered because Plaintiffs would be without other recourse to recover or modify their illegal / unconscionable loans. This is especially true in this

- 10 -

case where FIP has already advised its investors that they should attempt to individually collect from borrowers.  Furthermore, since, by defaulting, Defendants are deemed to have admitted the truth of Plaintiffs' averments, the evidence before the Court establishes that Plaintiffs will likely suffer great prejudice as their unassignable military pension benefits are continued to be automatically levied against by FIP's investors.  Conlon Decl., Ex. B.  Without modification or injunctive relief, these illegal loan and interest payments may continue indefinitely.

### 2.   Substantive Merits and Sufficiency of the Complaint

The second two *Eitel* factors "require that a plaintiff state a claim on which the [plaintiff] may recover." *Cal. Sec. Cans,* 238 F.Supp.2d at 1175 (citations and quotations omitted). In order to weigh these two factors, the Court must review Plaintiffs' claims.

Fortunately, the Court has already had an opportunity to examine the sufficiency of the Complaint.  On March 26, 2018, the Court decided Defendants' Motion to Strike Class Action Allegations and Dismiss Class Action Complaint.  *See* Order Granting in Part Defendants Motion to Strike and Dismiss [Dkt. 60].  In doing so, the Court determined that California law applies to Plaintiffs' claims due to the inclusion of a valid choice-of-law clause within the Agreement.  *Id.*, at pp. 17-20. Thus, Plaintiffs' claims should be judged under the appropriate California and federal legal standards.

### a.   *Plaintiffs' State Law Claims*

Plaintiffs pled four state law causes of action: violations of the UCL, CLRA, usury law, and unjust enrichment.  The Court previously found each well-pled. Specifically, when examining Plaintiffs' UCL and CLRA claims, the Court found that the factual allegations (*i.e.* that Defendants' representations of their transaction as a lawful "sales" agreement was false and misleading) were sufficient to satisfy Rule 9(b)'s requirements for pleading fraud.  *Id.*, at pp. 9-10.  Additionally, the Court also found that Plaintiffs' UCL, CLRA, usury law, and unjust enrichment claims were

well-pled pursuant to Rule 8(a) (*id.*, at pp. 11-12) and Defendants' legal challenges were also dismissed (*id.*, at pp. 19-21).  Nothing should displace the Court's initial findings.[4]

### (1)   Plaintiffs' UCL and CLRA Claims

Whether a representation is 'fraudulent' or 'misleading' under the UCL and CLRA is governed by the same legal standard: whether a "reasonable consumer" is "likely to be deceived."  *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 230 (2013).  The "primary evidence" of fraud in a UCL action is the document containing the misrepresentation.  *Brockey v. Moore*, 107 Cal.App.4th 86, 100 (2003).

In this case, Defendants have entered an example of the Agreement into evidence.  Declaration of Isabelle L. Ord ("Ord. Decl."), Dkt No. 30-2, Ex. A.  This document unquestionably supports Plaintiffs' claim that Defendants advertised their transactions as a 'sale' (and specifically, not a loan) and not an assignment of military benefits:

> 1. **Sale of Purchased Asset**; Payment of Purchase Price. Pursuant to the terms and conditions of this Agreement, and for the Term (as set forth on Exhibit A, attached hereto), Seller does hereby irrevocably sell, transfer and convey all right, title and interest in and to the Purchased Asset to PAS in return for the Purchase Price, as set forth on Exhibit A, attached hereto.
>
> 3.9. Valid Sale. Seller agrees that this Agreement constitutes a valid sale, transfer and conveyance of the Purchased Asset *and is not a loan or other financing transaction or intended to be regarded as a loan or other financing transaction*. If a court ever finds that the sale of the Purchased Asset was ineffective or that this Agreement created a loan rather than an absolute sale of the Purchased Asset, then this Agreement will serve as a security agreement under the Uniform Commercial Code or similar law of the state in which Seller resides.
>
> * * *
>
> **This agreement is not a loan or assignment.**
>
> **Except as provided for in the accompanying documents,**

---

[4] Although Plaintiffs' amended their Complaint, they did so only to add their tolling allegations and Mr. Driscoll's allegations.  *Compare* Complaint *with* FAC.

## there are no early termination permitted

Payee Name: John Underwood

Annuity Issuer: Defense Finance and Account Service

* * *

Purchased Payments: $397.00

Purchase Price: $10,000.00

Declaration of Isabelle L. Ord ("Ord. Decl."), Dkt No. 30-2, Ex. A at pp. 4-5, 27 (bold and underlining in original, italics added).

Defendants were also well aware that they were "purchasing" military benefits from Plaintiffs (and the Class).   Defendants documented that 'purchased' assets originated from the Defense Finance and Accounting Services, a government agency responsible for paying military retirees, their surviving spouses and other family members.   *See* https://www.dfas.mil/retiredmilitary.html.   Further, Defendant Kohn created marketing entities, such as Cash Flow Investment Partners, LLC, BuySell Annuity, Inc., and Pension Advance, LLC, to target pensioners, including military personnel who may be seeking a cash advance or "military retirement loan."   FAC ¶¶ 22-24, 31, 34, 68.

Through the stipulated default, Defendants admit the truth of Plaintiffs' allegations that Defendants' "Sales" Agreements are really loans and Defendants assigned Plaintiffs' military benefits.   FAC ¶¶ 3, 6; *Thomson v. Wooster*, 114 U.S. 104, 114 (1884); *In re Visioneering Construction*, 661 F.2d 119, 124 (9th Cir. 1981). Nevertheless, even absent this admission, Plaintiffs' contention that the Agreement is a loan is well supported.   Defendants' transactions have all the hallmarks of a loan, (1) the Agreement provided for the advance of money conditioned on the promise to repay it in installments over a set period; (2) Defendants reviewed the borrower's credit risk and engaged in standard loan underwriting assessment; and (3) Defendants

reserved a security interest in the pensioner's retirement or disability benefits.[5]  FAC ¶ 54.  Indeed, Judge Staton noted "six state regulators and the City of Los Angeles have found that Future Income Payments' products do constitute loans."  *Consumer Fin. Prot. Bureau v. Future Income Payments, LLC*, 252 F.Supp.3d 961, 967 (C.D. Cal. 2017).   This includes regulators with the California Commissioner of Business Oversight, which found that Defendants' Sales Agreement is a "loan" under California law.   *See* Plaintiff's Request for Judicial Notice ("RJN"), Dkt. 39.   Because Defendants misrepresented their 'loans' as 'sale agreements', Defendants have engaged in a 'fraudulent' or 'misleading' business practice under the UCL and CLRA.

### (2)   Plaintiffs' Usurious Loan Claims

Defendants' misrepresentations are not without prejudice.  The likely reason for Defendants' willing misclassification was to allow Defendants to charge a usurious interest rate.   For example, Defendants agreed to provide Plaintiff Underwood $10,000 in exchange for sixty monthly payments of $397 ($23,820 in total, not including fees) secured by, and paid out of, Plaintiff's military retirement and disability benefits.  The imputed interest rate on such a loan is 41.422%.  FAC ¶¶ 67-73.  Similarly, Mr. Driscoll was offered $31,804.00 for $1,000.00 per month for 60 months, amounting to an interest rate of 29%.   FAC ¶¶ 78-80.   The California Constitution, however, does not allow parties to contract for interest on a loan primarily for personal, family or household purposes for a rate exceeding 10% per year.   Cal. Const. Art. XV. Plaintiffs have thus sufficiently pled (and may seek judgment for) their usurious loan claims.

### (3)   Plaintiffs' Unjust Enrichment Claims

Defendants' scheme of converting regulated 'loan' transactions into unregulated 'sales' transactions was also likely a calculated attempt to shroud

---

[5] Defendants paradoxically claim they purchase the pensioner's benefits and also have a security interest in these benefits.  However, under either scenario, Defendants seek to assign these benefits to themselves.

Defendants' illegal assignment of military benefits from the regulatory eye. *See* 38 U.S.C § 5301(a)(3)(C), 37 U.S.C § 701(c), 15 U.S.C §§ 1601, *et seq*., and 16 C.F.R. § 444.2(a)(3).[6]   Given that Defendants' contracts are illegal (under the UCL, CLRA, California Constitution, and federal law), and thus unenforceable, Defendants' actions also support Plaintiffs' unjust enrichment claim. Cal. Civ. Code § 1668; *see also Lee On v. Long*, 37 Cal. 2d 499, 502 (1951) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out."). As was previously noted by the Court:

> Unjust enrichment is not a cause of action, however, or even a remedy, but rather a general principle, underlying various legal doctrines and remedies." *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014). An unjust enrichment claim cannot lie if there is a valid express contract covering the same subject matter. *Id*. "However, restitution may be awarded . . . when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *Id*. Thus, a party to an express contract can assert a claim for restitution based on unjust enrichment by alleging in that cause of action that the express contract is void or was rescinded." *Id*. (internal quotations and brackets omitted). [¶] Because Plaintiff alleges that the Agreement was procured by fraud, is unenforceable, constitutes unlawful debt, and is void as a matter of law, Plaintiff may seek restitution through his unjust enrichment claim.

*See* Order Granting in Part Defendants Motion to Strike and Dismiss [Dkt. 60], at pp. 20-21.  A similar result should follow here.

### b.   *Plaintiffs' Federal Cause of Action*

Defendants' fraudulent sale of unlicensed loans and continuing collection of usurious interest payments also gives rise to Plaintiffs' federal causes of action: violations of the Truth in Lending Act ("TILA"), Racketeer Influenced and Corrupt Organizations Act ("RICO"), Unjust Enrichment, and Declaratory Relief claims.

### (1)   Plaintiffs' TILA Claims

TILA requires a lender to make certain material disclosures to a consumer

---

[6]   While Plaintiffs 'fraudulent' UCL claims support judgment in this case, Defendants' business practices are also unlawful and unfair for similar reasons. *State Farm Fire & Cas. Co. v. Sup. Ct*., 45 Cal.App.4th 1093, 1102-03 (1996) ("Virtually any law-federal, state or local can serve as a predicate for a section 17200 action.");

before consummation of a loan contract. 15 U.S.C. § 1638(a)-(b); 12 C.F.R. § 1026.17(a)-(b), 1026.18. Among the required material disclosures in a closed-end credit transaction are the APR. 15 U.S.C. §§ 1602(v), 1638(a)(3)-(4); 12 C.F.R. § 1026.18(d)-(e). As argued above, Defendants' Agreements represent closed-end credit (personal loan) contracts, and therefore are subject to TILA's disclosure requirements. Yet, Defendants failed to disclose the APR in their Agreements, preventing veterans from fully appreciating the true cost of the loans and limiting their ability to contrast Defendants' product with other options. *See generally* Ord. Decl., Ex. A. Thus, Plaintiffs are entitled to judgment on their TILA claim.

(2)     Plaintiffs' RICO Claims

Plaintiffs' RICO claims are likewise ripe for adjudication. RICO Section 1962(c) provides that "[i]t shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity *or collection of unlawful debt*." *Id.* (emphasis added).

Here, Defendant Kohn created, owned, and operated several businesses to advertise, solicit, make, and collect illegal loans to and from pensioners across the nation. *See* FAC ¶¶ 21-25, 34-37. These allegations, admitted by Defendants' default, are sufficient to establish Plaintiffs' RICO claims. *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 652 F. Supp. 101, 103 (E.D.N.Y. 1986) (To state a claim for collection of an unlawful debt under RICO, plaintiff must show that the loan carries twice the enforceable interest rate and is incurred in connection with the business of lending money at a usurious rate); *Cedric Kushner Promotions, LTD., v. Don King*, 533 U.S. 158 (2001) (while the enterprise required by the statute must be more than the person operating under another name, the requisite distinctness between respondent and his corporation was established since they were legally different entities). Plaintiffs' RICO claims are also well pled.

- 16 -

(3)     Plaintiffs' Declaratory Relief Claims

Given the sheer illegality of Defendants' business practices, Plaintiffs also seek a declaration clarifying their obligations, and those of class members, under the Agreement:

a.     The transaction evidenced by the Agreement is, under law and equity, a loan, subject to applicable usury limitations on the maximum permissible rate of interest which may be charged and recovered;

b.     Defendants may not enforce or collect any amount from Plaintiffs or class members beyond return of the principal of the loan, because the interest rate evidenced in the Agreements with Defendants exceeds the maximum permissible rate set forth in Cal. Const. Art. XV, § 1;

c.     The provisions of the Agreement purporting to require Plaintiffs and class members to provide Defendants direct access to military benefits are void and unenforceable attempts to circumvent the prohibition upon assignments of military benefits set forth in 38 U.S.C. § 5301(a)(3)(C), 37 U.S.C. § 701(c), 15 U.S.C. §§ 1601, *et seq.*, and 16.C.F.R. § 444.2(a)(3);

d.     The provision in the Agreement purporting to cause all remaining and unpaid payments to be immediately due and payable if there is "any disruption, interruption or decrease in those payments . . . caused by the [veteran]" is an unenforceable penalty clause; and

e.     The Agreement is unconscionable and unenforceable, and/or void as a matter of law.

*See* FAC at ¶ 98.  Such relief is necessary and proper as Defendants have advised their investors to collect any debts from Plaintiffs and the Class directly and a declaration nullifying the Agreements will prevent any future third-party collection attempts. Conlon Decl., Ex. B; *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 968 (9th Cir. 1942) (Declaratory relief is proper if "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue.").

Plaintiffs' Complaint properly alleges the necessary elements for each causes of action.  *Id.*  Again, because Defendants' failure to defend this action constitutes an admission as to the averments contained in the complaint, the Court must accept these allegations as true. Accordingly, the second and third *Eitel* factors likewise favor entry of default judgment against Defendants.

3.     Amount at Stake

Under the fourth *Eitel* factor, "the court must consider the amount of money at

stake in relation to the seriousness of Defendant's conduct." *Cal. Sec. Cans.*, 238 F.Supp.2d at 1176; *see also Eitel,* 782 F.2d at 1471–72.

As explained below, Plaintiffs seek a total award of $1,385,445.84. Plaintiffs reached this amount by calculating the sum of the total actual damages, statutory treble damages and civil penalties, and attorneys' fees and costs.

This amount is conservative and reasonable in light of Defendants' misconduct. Despite investigations and warnings by various state and federal agencies, Defendants continued to illegally lend to financially vulnerable veterans and collect the usurious interest on these loans. But for Plaintiffs bringing this action, they would have been on the hook for an additional $932,120.00 in payments to Defendants. Accordingly, this factor favors granting default judgment.

### 4.   Possibility of Dispute

The fifth *Eitel* factor considers the possibility of dispute as to any material facts in the case. Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc.,* 826 F.2d at 917–18.  As established above, Plaintiffs filed a well-pleaded complaint alleging the facts necessary to establish their claims, the Court sustained those claims in substantial part denying Defendants' Motion to Dismiss and attempt to strike the class allegations, and the court clerk entered default against the Defendants. Thus, no dispute has been raised regarding the material averments of the complaint, and the likelihood that any genuine issue may exist is, at best, remote. Indeed, Defendants have already entered into a consent order in New York involving virtually identical transactions, and California has already determined these transactions are loans.  This factor therefore strongly favors the entry of default.

### 5.   Possibility of Excusable Neglect

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. Due process requires that all interested parties be given notice reasonably calculated to apprise them of the pendency of the action and be afforded

- 18 -

opportunity to present their objections before a final judgment is rendered. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). In this case, Defendants received notice of both the complaint and participated in their defense, and even appeared through counsel before withdrawing and announcing their intent to abandon their defense.  Nevertheless, Defendants consciously chose to stipulate to a Default Judgment.  In light of these facts, the possibility of excusable neglect is nonexistent.  Accordingly, the default has not resulted from excusable neglect, but rather from intentional abandonment, and therefore the sixth *Eitel* factor favors granting a default judgment.

### 6.   Policy Implications Favoring Decisions on the Merits

Finally, the mere existence of Fed.R.Civ.P. 55(b) indicates that the seventh *Eitel* factor is not alone dispositive. *Cal. Sec. Cans.,* 238 F.Supp.2d at 1177. "Moreover, Defendant's failure to answer [Plaintiff's] Complaint makes a decision on the merits impractical, if not impossible. Under FRCP 55(a), termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action." *Id.* This is precisely what occurred in the present case. Therefore, the seventh *Eitel* factor does not preclude the Court from entering default judgment against Defendants. *Id.*

### C.   Remedies

Fed.R.Civ.P. 54(c) allows only the amount prayed for in the complaint to be awarded to the plaintiff in a default. Under Fed.R.Civ.P. 8(a)(3), the demand for relief must be specific. In addition, Plaintiff must "prove up" the amount of damages that it is claiming. In the instant motion, Plaintiffs seek a permanent injunction, damages in an amount of $1,037,328.88, attorneys' fees in the amount of $341,827.74, and costs in the amount of $6,289.22. These remedies do not differ from the relief prayed for in the complaint.

### 1.   Damages

Plaintiffs' counsel represent 40 Plaintiffs, who calculate that they have suffered

- 19 -

$209,332.22 in actual damages, which they may recover under California and common law. Conlon Decl. ¶ 14. This sum reflects the amounts Plaintiffs paid to Defendants, including principal, interest, and fees, less the amounts Plaintiffs received as loan proceeds. In addition, Plaintiffs are entitled to treble damages under RICO, which amount to $627,996.66. 18 U.S.C. § 1964(c). Because Plaintiffs are senior citizens, they are each entitled to an additional civil penalty of $5,000.00 under the CLRA, totaling $200,000.00. Cal. Civ. Code § 1780(b)(1). Thus, the sum of sought damages equals $1,037,328.88.

For the reasons detailed above, a damages award of $1,037,328.88 seems reasonably calculated to serve all of the above stated purposes and, compared to Plaintiffs' actual damages (including treble damages under RICO), is a conservative award.

## 2.  Injunctive Relief is Appropriate

Plaintiffs are also entitled to permanent injunctive relief. The CLRA, UCL and FAL are law enforcement tools designed to protect consumers and deter wrongdoing. *Lavie v. Procter & Gamble Co*., 105 Cal.App.4th 496, 503 (2003).  Accordingly, each of these statutes allows the Court to "make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." Bus. & Prof. Code § 17203; Civ. Code § 1780(a)(2); *see also generally Thompson v. 10,000 RV Sales, Inc*., 130 Cal.App.4th 950, 960 (2005).

In this manner, the "purpose of the injunctive relief provision of the CLRA [and UCL] is not to resolve a private dispute but to remedy a public wrong.... In other words, the plaintiff in a CLRA damages action is playing the role of a bona fide private attorney general." *Broughton v. Cigna Healthplans*, 21 Cal.4th 1066, 1080 (1999).  This distinguishes the injunctive relief available under the CLRA, UCL and FAL from private injunctive relief between the parties, as Plaintiffs may use the CLRA, UCL and FAL to obtain "public injunctive relief—i.e., relief that "by and

- 20 -

large" benefits the general public." *McGill v. Citibank, N.A.*, 2 Cal.5th 945, 955 (2017).

In this instance, Plaintiffs request that the Court issue a permanent injunction against Defendants and their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, that includes the following material terms:

(1)     A prohibition against soliciting or creating any further cash advances or loans, especially if secured or connected to veterans' unassignable pension benefits; and

(2)     A prohibition against collecting or transferring any amounts from veterans beyond the amount of the initial advance from FIP.

The proposed injunctive relief is necessary and appropriate because the claims otherwise warrant an injunction, and Defendants, though well aware of serious claims brought against them, have chosen to abandon this lawsuit. Furthermore, Defendants have advised their investors (most of them laypersons) to begin collecting these debts on their own, and Defendants set the loan payments up as automatic ACH payments through each borrower's bank, so without injunctive relief (allowing the banks to stop these payments) the illegal payments may continue. Failure to grant the injunction would needlessly expose the Plaintiffs to the risk of continuing irreparable harm.

### 3.     Costs and Attorneys' Fees

Plaintiffs' RICO and TILA claims both allow the recovery of reasonable attorney fees. *See* 18 U.S.C. § 1964(c); 15 U.S.C. § 1640(a)(3). Similarly, the CLRA requires an award of recovery of attorneys' fees and costs to a prevailing plaintiff. Cal. Civ. Code § 1780(e). The California Supreme Court has endorsed the "lodestar" method based on "careful compilation of the time spent and reasonable hourly compensation of each attorney ... involved in the presentation of the case." *Serrano v. Priest*, 20 Cal.3d 25, 48 (1977). The amount of attorney's fees or lodestar is:

the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including ... (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.

*Ketchum v. Moses*, 24 Cal.4th 1122, 1131-32 (2001).

"In cases involving enforcement of constitutional rights, but little or no damages, [ ] fee enhancements may make such cases economically feasible to competent private attorneys." *Id.*, at 1133.  Indeed, the CLRA provision for recovery of attorney fees allows consumers to pursue remedies in cases where the compensatory damages are relatively modest; to limit the fee award to an amount less than that reasonably incurred in prosecuting such a case, would impede the legislative purpose underlying the CLRA.  *Graciano v. Robinson Ford Sales, Inc.*, 50 Cal.Rptr.3d 273 (2006).

Plaintiffs' counsel took this case on contingency, successful litigated it past Defendants' Motion to Dismiss, and secured a judgment in Plaintiffs' favor.  Conlon Decl. ¶ 11.  In doing so, Plaintiffs ensure that no future unconscionable loan payments will be exacted from Plaintiffs or the Class.  Additionally, Plaintiffs' counsel will continue its efforts to secure monetary restitution and damages for the Plaintiffs.

Although, Local Rules establish a formulaic calculation of attorneys' fees, fees in excess of Rule 55-3's schedule should be granted.  In total, Plaintiffs' counsel accumulated $341,827.74 in lodestar on work including opposing Defendants' Motion to Dismiss, serving discovery requests on Defendants, interviewing potential witnesses and class members, and negotiating this unconsented judgement which includes damages, injunctive and declaratory relief.  Conlon Decl. ¶ 12.  Plaintiffs

have also incurred $6,289.22 in costs for this case. *Id*. ¶ 13. Accordingly, the Court should grant Plaintiffs' request for an award of attorneys' fees and costs in the amount of $348,116.96.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for default judgment should be granted and Plaintiffs and their counsel should be awarded damages, attorney fees, costs, and permanent injunctive relief.

DATED: August 2, 2018                      Respectfully submitted,

                                           JTB LAW GROUP, LLC

                                           By:  /s/ *Jason T. Brown*
                                                Jason T. Brown

                                           Jason T. Brown (admitted pro hac vice)
                                           Nichlas Conlon (admitted pro hac vice)
                                           155 2nd Street Suite 4
                                           Telephone: (201) 630-0000
                                           Facsimile:  (855) 582-5297
                                           jtb@jtblawgroup.com
                                           nicholasconlon@jtblawgroup.com

                                           Jeffrey R. Krinsk, Esq.
                                           Trenton R. Kashima, Esq.
                                           FINKELSTEIN & KRINSK LLP
                                           550 West C St., Suite 1760
                                           San Diego, CA 92101-3593
                                           Telephone:  (619) 238-1333
                                           Facsimile:  (619) 238-5425

                                           Lance C. Young (will pro hac vice)
                                           Amy L. Marino (will pro hac vice)
                                           Rod M. Johnston (will pro hac vice)
                                           SOMMERS SCHWARTZ P.C.
                                           One Towne Square, 17th Floor
                                           Southfield, MI 48076
                                           Telephone: (248) 355-0300
                                           lyoung@sommerspc.com
                                           amarino@sommerspc.com
                                           rjohnston@sommerspc.com