JS-6

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN UNDERWOOD**, individually and on behalf of all others similar situated,<br><br>Plaintiff,<br><br>v.<br><br>**FUTURE INCOME PAYMENTS, LLC**; **PENSIONS, ANNUITIES AND SETTLEMENTS, LLC**; **CASH FLOW INVESTMENT PARTNERS, LLC** (dismissed), and **SCOTT A. KOHN,**<br><br>Defendants. | Case No: 8:17-cv-01570-DOC-DFM<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT** [74] |

Plaintiffs brought the above-captioned lawsuit against Defendants Future Income Payments, LLC ("FIP"); Pensions, Annuities and Settlements, LLC; and Scott A. Kohn. The Court draws the following facts from the Complaint ("Compl.") (Dkt. 1). Defendant FIP is a Delaware limited liability company with its principal places of business in California. Compl. ¶¶ 11, 15. FIP formerly did business as Pensions, Annuities, and Settlements, LLC ("PAS"). *Id*. ¶ 16. FIP also maintains several marketing affiliates, such as Cash Flow Investment Partners, LLC and BuySellAnnuity, LLC. *Id* ¶ 20. FIP's business solicits pensioners to enter into loan agreements through its marketing affiliates' websites. *Id*. ¶ 21. In exchange for some

or all of their monthly pension for a term (generally five to ten years), FIP provides pensioners a lump sum payment. *Id*. FIP also contracts with investors who provide money for the lump sum cash payments in exchange for some or all of the pensioners' monthly pension payments. *Id*.

Scott A. Kohn is the sole owner of FIP. *Id*. ¶ 23. He is FIP's President, Secretary, Treasurer, sole member, and has complete authority over its decision making process. *Id*. Kohn is also the sole owner of FIP's affiliated marketing entities, like Cash Flow Investment Partners and BuySellAnnuity. *Id*.

In May 2003, the National Consumer Law Center ("NCLC") reported that companies and individuals were allegedly scamming military personnel by offering upfront cash payments in return for several years of the veterans' benefits. *Id*. ¶¶ 25–26. These companies profited by charging an interest rate between 27% and 106% on loans averaging $40,000-$55,000, depriving veterans of money needed to establish long-term financial security. *Id*. ¶¶ 26, 28. These companies allegedly preyed on vulnerable veterans. *Id*. ¶ 27.

FIP is one such company. *See generally id*. FIP solicited pensioners across the nation, including in California. *Id*. ¶ 30. FIP steered internet searches to its website. *Id*. ¶¶ 32–33. It advertised its product as a lump-sum pension buyout, or pension advance, allowing pensioners to obtain cash quickly to meet their immediate needs and long-term goals. *Id*. ¶ 31. FIP told its employees to avoid the term "loan." *Id*. ¶ 34. FIP's training manual notes that its products are not loans. *Id*. ¶ 35.

Pensioners would contact FIP through its website to obtain a quote and begin the application process. *Id*. ¶ 38. FIP representatives would contact the pensioner to collect information and documents to allow FIP to complete the underwriting process. *Id*. If FIP verified the pensioners' information, it proposed to give pensioners a lump-sum payment in exchange for a specific amount of the pensioners' monthly pension payments. *Id*. ¶ 40. To complete the loan process, pensioners would complete and sign

several documents, which FIP referred to as the "Seller Packet." *Id*. ¶ 41. Although the Seller Packet had several variations, it consisted of approximately nine documents: (1) a contract entitled "Future Income Stream Purchase and Sale Agreement," "Buyer and Pensioner Purchase Agreement for Purchase of Future Income Stream," or "Future Income Payment Purchase and Sale Agreement"; (2) Transaction Details; (3) Authorization for Automatic Payments; (4) Disclosures and Acknowledgments; (5) Certificate of Marital Status; (6) Security Guaranty and Indemnification Agreement; (7) Purchase Agreement; (8) Employment Verification Form; and (9) W9-Request for Taxpayer Identification Number and Certification. *Id*. ¶¶ 41–42. Some pensioners were required to submit additional documents, such as proof of life insurance amount, a voided check, photo identification, or a telephone bill. *Id*. ¶ 43. Once FIP received all these documents, pensioners executed a loan agreement with the company. *Id*. ¶ 44.

The agreements also allowed FIP to sell the pensioners' monthly payments to a third party. *Id*. ¶ 46. These third parties were investors who provided the lump sum funds that were paid to pensioners. *Id*. ¶ 47. Until 2015, FIP required pensioners to personally guarantee repayment of the lump-sum loan amounts. *Id*. ¶ 48. After receiving the lump sum from FIP, pensioners would instruct the financial institution where their pension payments were deposited to transfer part of their pensions into a FIP-controlled account. *Id*. ¶ 49. To facilitate the collection of the obligated payments, FIP required pensioners to execute an authorization granting FIP power to collect the pension payments from the pensioners' accounts. *Id*. FIP would deduct $300 from the lump sum amount as an account set-up and servicing fee. *Id*. ¶ 51. Until September 2014, it also charged a monthly $10 "Management Fee." *Id*.

Although FIP's agreements with pensioners referred to their product as a "sale," it was really a loan. *Id*. ¶ 53. The agreements required pensioners to repay the money in installments over a set period and acknowledged that the lump sum was

- 3 -

"significantly less" than the amount the pensioner would pay. *Id*. ¶ 53(a)–(b). And before extending the loan, FIP reviewed the borrower's credit risk and engaged in standard loan underwriting assessment. *Id*. ¶ 53(c). For instance, borrowers had to supply FIP with income tax returns, pay checks or stubs, and evidence of other financial status. Id. Moreover, the agreements required the pensioner to pay FIP legal fees and costs if FIP pursued a claim against the pensioner. *Id*. ¶ 53(g). The pensioners were also subject to late fees. *Id*. ¶ 53(h). Some of FIP's agreements even threatened pensioners with "criminal fines or imprisonment" if the pensioner intentionally deprived FIP of "the economic benefits contemplated by [the] agreement." *Id*. ¶ 54.

Plaintiff John Underwood is a retired and disabled veteran of the United States Air Force. *Id*. ¶¶ 2, 14. After serving for 23 years, Underwood retired from the Air Force with the rank Master Sergeant in 2010. *Id*. ¶ 14. Underwood resides in Otway, Ohio and receives a retirement income of $2,053 per month. *Id*. Shortly after his retirement from the Air Force, Underwood saw a FIP online advertisement describing cash advances for military personnel. *Id*. ¶ 67. Around December 2012, Underwood contacted PAS about obtaining upfront cash payment in exchange for "his payment of a substantially larger amount over time." *Id*. ¶ 68. After eliciting information about Underwood's military retirement benefits, checking his credit, and obtaining other related information, Defendants informed Underwood that FIP would provide him $10,000 in cash, less fees, if he promised to pay FIP $397 per month over 60 months ("Agreement"). *Id*. Shortly after Underwood agreed, he received $9,700 as net loan proceeds. *Id*. ¶ 71. To date, Underwood has already paid $20,644 for a $9,700 loan. *Id*. As things stand, Underwood is on pace to repay approximately $23,820. *Id*. ¶ 72. FIP did not disclose material information to Underwood, such as how federal law prohibits the assignment of a military pension or disability benefits. *Id*. ¶ 73.

On September 11, 2017, Underwood brought this action, on behalf of himself and other similarly situated retired enlisted military personnel or disabled military

personnel, for: (1) declaratory relief holding that the agreements that class members entered into are unenforceable; (2) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 *et seq.*; (3) violation of California's Usury Law, California Constitution article XV, § 1; (4) violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.*; (5) violation the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; (6) violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, (only against Kohn); and (7) unjust enrichment. *Id.* ¶¶ 80–130.

Defendants appeared before the Court on October 9, 2017 and moved to dismiss Underwood's claims and strike the Complaint's class allegations on November 9, 2017. Dkt. 21, 30. This motion was denied, in part, by the Court on April 26, 2018. Dkt. 60. The Court dismissed, without prejudice, Underwood's UCL, Usury, CLRA, TILA, and RICO claims—to the extent that the underlying allegations fall outside the applicable statute of limitations for each claim. *Id.* Underwood amended his complaint to add Plaintiff John Driscoll and alleged tolling allegations. Dkt. 63 ¶¶ 75-60.

On May 31, 2018, Defendants stipulated to entry on default and indicated that they did not intend to themselves further in this matter. Dkt. 67. Default was subsequently entered by the Clerk (Dkt. 72) and Plaintiffs brought a motion for default judgment which is now before the Court. Dkt. No. 74.

The Court has reviewed the file, Plaintiffs' motion for default judgment, and the supporting documentation. It is hereby ORDERED, ADJUDGED, and DECREED that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in Plaintiffs' Complaint.

2. The Court finds that the conduct alleged in the First Amended Complaint constitutes violations of UCL, California's Usury Law, CLRA, TILA, and RICO.

3. Plaintiffs have suffered damages and monetary losses as a result of Defendants' conduct. On review and consideration of all relevant factors, Plaintiffs are entitled to damages restitution, declaratory, and injunctive relief on the claims as set forth in the First Amended Complaint.

4. Plaintiffs' motion for default judgment is GRANTED and final judgment is hereby entered against Defendants, and in favor of the Plaintiffs, on the claims set forth in Plaintiffs' First Amended Complaint.

5. The Court declares that Defendants' Future Income Stream Purchase and Sale Agreement constitutes an unlawful loan.

6. Defendants and all of their past and present officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for them or on their behalf, including, but not limited to, any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Defendant or Defendant's representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

   (1) Soliciting or creating any further cash advances or loans secured or connected to veterans' unassignable pension benefits; and

   (2) Collecting or transferring any amounts from veterans beyond the amount of the initial advance from FIP.

7. Defendants are hereby ordered to pay damages in the amount of $1,037,328.88, which includes actual damages, treble damages, and civil penalties. Defendants are found jointly and severally liable for this amount.

8. Defendants are hereby ordered to pay $6,289.22 in costs and $341,827.74

in attorneys' fees. Defendants are found jointly and severally liable for this amount.

9. The Court retains jurisdiction over this matter and the parties to this action in order enforce any violation of the terms of this final judgment and permanent injunction.

IT IS SO ORDERED.

DATE: September 27, 2018

*David O. Carter* (signature)

David O. Carter
United States District Judge

- 7 -
ORDER GRANTING PLAINTIFF'S MOTION FOR
ENTRY OF DEFAULT AND DEFAULT JUDGMENT